NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TOM WOOD PONTIAC, INC.,
Respondent.

No. 18778.

United States Court of Appeals,
Seventh Circuit.

July 23, 1971.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Judith

P. Wilkenfeld, Atty., N. L. R. B., Washington, D. C., for petitioner.

George V. Gardner, Asa Ambrister, Gardner & Ambrister, Washington, D. C., for respondent.

Before DUFFY, Senior Circuit Judge, and KILEY and STEVENS, Circuit Judges.

KILEY, Circuit Judge.

The National Labor Relations Board (Board) seeks enforcement of its order finding that respondent (Company) violated Section 8(a) (1) and (3) of the National Labor Relations Act.[1] The order will be enforced.

The Union[2] began its organizational drive in the Company's body and fender shop in October, 1968, and filed an election petition on November 14, 1968. On the same day, the Union and the Company entered into a Stipulation for Election upon Consent Agreement. The election was set for December 13, 1968.

About a week after the stipulation was reached, body shop manager Schmaltz called a meeting of all the body men and introduced them to Laster, the Company's new labor relations consultant. Laster told the employees that he wanted to take a survey among the employees to learn their "gripes or complaints" so that "Tom Wood could make it a better place for his employees to work, working conditions a little better." Each employee was then given a questionnaire containing thirty-three questions and was asked to fill out the questionnaire but not to sign it. The questions dealt with the employees' opinions regarding wages, fringe benefits, work hours, supervisory practices, promotion policy, and job security. The final question asked the employee what he would do to improve conditions if he were the boss.

The main issue raised by the Company is whether the Board erroneously concluded—contrary to the Trial Examiner—that the Company's purpose in conducting the opinion survey was to learn what the employees' complaints were and to impliedly promise to remedy them, and that this conduct violated 8(a) (1).[3]

■ There is nothing violative of the Act in a Company's holding of meetings to determine employee grievances, so long as "the discussions avoided any attempt by the company to imply promises of benefit if the union was defeated." H. L. Meyer Co. v. NLRB, 426 F. 2d 1090, 1093 (8th Cir. 1970); Fairchild Camera and Instrument Corp. v. NLRB, 404 F.2d 581 (8th Cir. 1968).[4] Nor does the use of opinion surveys per se violate Section 8(a) (1). The Board itself has recently approved the use of surveys in ITT Telecommunications, a Division of International Telephone and Telegraph Corporation, 183 N.L.R.B. No. 115 (1970). However, an 8(a) (1) violation is committed if the solicitation of employee grievances is "accompanied by an express or implied promise of benefits specifically aimed at interfering

1. 29 U.S.C. § 151 et seq.

2. District 90 of the International Association of Machinists and Aerospace Workers, AFL–CIO.

3. The Company concedes here the 8(a) (1) violations with respect to the conduct of shop manager Schmaltz, owner Wood, and shop foremen Wiethoff and Morelock in illegally interrogating employees about— and creating the impression of surveillance concerning—Union meetings, in threatening to close the shop if the Union came in, and in imposing harsher new work rules on the employees immediately following. the Union's election victory.

4. The Company concedes that one purpose of the opinion survey was to learn what complaints the employees had concerning their working conditions. The record amply supports the Company's concession —and the Examiner's and Board's findings—as to this purpose of the survey. The Company conducted the survey only a few days after the election date had been fixed under the direction of its newly hired outside labor consultant. And all of the questions were directed at employment conditions in the shop and how the employees felt these conditions compared with those in other plants in the area.

with, restraining, and coercing employees in their organizational effort," *ITT Telecommunications, supra,* at 3; *cf.* NLRB v. Taitel, 261 F.2d 1 (7th Cir. 1958), cert. denied, 359 U.S. 944, 79 S. Ct. 725, 3 L.Ed.2d 677 (1959), or if the survey includes inquiries concerning the employees' union interests, Struksnes Construction Co., 165 N.L.R.B. 1062 (1967); *cf.* NLRB v. Quick Shop Markets, Inc., 416 F.2d 601 (7th Cir. 1969).

■ We find substantial evidence in the record as a whole to support the Board's conclusion that the purpose of ascertaining the employees' grievances was to impliedly represent to the employees that their grievances would be remedied if the Union was defeated. Laster, the survey organizer and distributor, repeatedly told the employees that there was no point in having a union because the Company would be equally willing to remedy complaints without one. At the outset of the survey meeting he told the employees that he wanted to take the survey so that the Company could improve the working conditions and that "There are some things that we can get corrected now. Some things that are going to take a while to correct, and there are some things that may never be corrected."

The survey questions in themselves are perhaps protected under Section 8(c) of the Act if viewed in isolation. However, Laster's comments gave color and meaning to the questions revealing, to the Board, the Company's purpose in conducting the survey. An employer's "willingness to receive and consider employee requests at a time which coincided with the first union organization campaign * * * might well have indicated to the average employee that better conditions would be forthcoming." NLRB v. Yokell, 387 F.2d 751, 755 (2nd Cir. 1967). And the Board could find that questions were asked in a way that would leave the employees with the impression that the Company was promising to remedy the employees' grievances if they would "forget" the Union.

Laster's request that the questionnaires be unsigned did not require the Board to find the survey lawful. Consideration of secrecy is relevant in determining the legality of a poll to determine a union's majority since the secrecy will assure that no reprisals against employees would be taken, *Struksnes Construction Co., supra,* at 1063. But secrecy in the survey does not affect whether an implicit promise of future reform was intended or conveyed.

We conclude that the Board's finding that the opinion survey violated 8(a) (1) is supported by substantial evidence on the record as a whole, and since that finding by the Board "only disagree[s] with the examiner as to inferences to be drawn from the established facts," the Board's order must be enforced. NLRB v. Stafford Trucking Co., Inc., 371 F.2d 244, 249 (7th Cir. 1966).

■ Laster told employee Madden that if the Union won, he was "pretty sure" that the employees would "be out on the street by the first of January." The Board decided the statement violated Section 8(a) (1). The Company conceded other coercive conduct, and there is no exculpating testimony by Laster. The Board could properly infer from the statement, therefore, a threat of discharge should the Union win, even if the statement viewed in isolation could have reasonably been construed as meaning that if the Union won, it might pull the employees out on strike. *Cf.* NLRB v. Kolmar Labs, Inc., 387 F.2d 833, 838 (7th Cir. 1967); Lincoln Mfg. Co. v. NLRB, 382 F.2d 411, 415 (7th Cir. 1967), cert. denied, 389 U.S. 972, 88 S. Ct. 470, 19 L.Ed.2d 463. Since either inference is reasonable, we cannot reject the Board's inference. The Board need not have taken the statement as a prediction of demonstrable economic consequences of unionization and was justified in inferring a threat "to throw employees out of work regardless of the economic realities"—a statement not protected under Section 8(c) of the Act. NLRB v. Gissel Packing Co., 395 U.S.

575, 619, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969).

We conclude that the Board was justified in finding that Laster's statement to employee Madden violated Section 8(a) (1) of the Act.

Employee Roberts began working for the Company in early June, 1968, and became an active Union leader in the following October organization drive. Twice before the election, shop manager Schmaltz interrogated Roberts about Union meetings.[5] The day following the Union's election victory on December 13, 1968, the new shop manager Wiethoff formally reprimanded Roberts for low productivity, tardiness, and participation in "group bull sessions during working hours." On January 3, shop foreman Morelock reprimanded Roberts for being nine minutes late and told him to stay in his work area at the front of the shop. Roberts, whose job was replacing bumpers, protested that when he was hired he was told he was to learn metal work, and that he could not do so if he was separated from the metal men who worked in the back. Morelock replied, "I know that you want to run this shop, but you're not going to, because Mr. Wood owns it and runs it." On January 15 Roberts was discharged.

The Board found that Roberts' discharge was for his Union activities and violated Section 8(a) (3) and (1) of the Act. We think there is substantial evidence on the record as a whole to support these findings. Roberts' weekly earnings, based on productivity, for the period November 1—the date on which Wiethoff became foreman—to his discharge had been slightly greater than in the pre-November period, and his productivity had never been criticized prior to November. And although the reprimand referred to Roberts' tardiness—as well as to low productivity—there is no evidence that Roberts had been warned for tardiness prior to the election, and Weithoff admitted that many of the em-ployees were often tardy. The "group bull sessions" reprimand indicates that other employees were involved as well as Roberts, but he alone was warned. The Board did not err in concluding that the reprimand was a pretext to hide the motive of firing Roberts for his Union activity.

This conclusion justified the further finding that Roberts was illegally discharged. The Company knew Roberts was a "main man" in the Union. It had interrogated him prior to the election about Union meetings, and in the work day thereafter pretextually reprimanded him. He was told his discharge was because, inter alia, his work as bumper man was being eliminated. But the Company continued doing the bumper work, with commissions—previously earned by Roberts—distributed among his previous fellow body men. We need not repeat the other Company actions directed at Roberts which indicated its animus toward him. The anti-Union bias and unfair labor practices were "proper and highly significant factors for Board evaluation in determining motive" for Roberts' discharge. NLRB v. Dan River Mills, Inc., 274 F.2d 381, 384 (5th Cir. 1960).

The Company, to justify the discharge, points to Roberts' low earnings and the Company's consequent loss of earnings during the week of December 19, to the new policies of the new shop manager and foreman, and to the fact that other Union organizers were not discharged and no new bumper man was hired. The Company's argument is plausible. And the Trial Examiner and Board admitted that Roberts' discharge was "one of these difficult cases." Yet they both found that Roberts was discharged at least in part because of Union activity. The finding is supported by substantial evidence on the record as a whole. We cannot redetermine this issue. NLRB v. Byrds Mfg. Corp., 324 F.2d 329, 332–333 (8th Cir. 1963).

The order is enforced.

---

5. These interrogations were found to be separte 8(a) (1) violations, and are not contested by the Company.