**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Gerald G. GOGIN, d/b/a Gogin Trucking, Respondent.**

**No. 77–1718.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1978.

Decided April 11, 1978.

Elliott Moore, Deputy Assoc. Gen. Counsel, David A. Fleischer, William R. Stewart, Attys., N. L. R. B., Washington, D. C., for petitioner.

Russ R. Mueller, Milwaukee, Wis., for respondent.

Before CASTLE, Senior Circuit Judge, and SWYGERT and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The National Labor Relations Board seeks, pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. §§ 151, et seq., enforcement of its order issued May 10, 1977 against Gerald Gogin, d/b/a Gogin Trucking (hereinafter the Company).[1]

The Board[2] found that the Company violated: (1) Section 8(a)(1) of the Act by coercively interrogating two employees; (2) Sections 8(a)(3) and (1) of the Act by discriminatorily discharging one employee and by laying off and failing to recall another employee; and (3) Sections 8(a)(5) and (1) of the Act by refusing to bargain with, and withdrawing recognition from, the Union[3] as the bargaining representative of its employees.

## I.

### Section 8(a)(1) Violations

In response to a loss of business from two of the Company's customers in January of 1976 because of its non-union status, the Company called a meeting on January 20. At this meeting, at which all of the city drivers were present, but none of the over-the-road drivers,[4] Mr. Gogin advised the employees of the loss of the customers and asked whether they had any suggestions for dealing with the problem. The employees were told they could sign a petition asking the union to talk to them, and after hearing from the union they could decide on whether to join. Gogin told them that whatever they decided was all right with him. A majority of the employees present decided to contact the union and drew up a petition for this purpose. They asked a fellow employee, Laise, to act as their representative in this regard. Laise went to the union business agent, Fularczyk, and received authorization cards. These cards were to be signed by the employees if they wanted the union to represent them in negotiating with the Company. Laise was told by the union to solicit both the city drivers and the over-the-road drivers. When Mr. Gogin heard that the over-the-road drivers were also being solicited by the union through Laise, he protested and told Laise that that group had nothing to say about the union, for the union was only for the city drivers.

On January 23, Scutchfield, an over-the-road driver, was presented with an authorization card, which he signed and returned. Later that same day Gogin asked him if he had been approached about joining the union, and added that the over-the-road drivers would not be allowed to unionize. Gogin told Scutchfield that he would sell the trucks before he would allow that to happen, and told Scutchfield he would be transferred to city driving if it did happen.

Gogin phoned another over-the-road driver, Hawver, and told him that the Company

1. The Board's Decision and Order is reported at 229 NLRB No. 18.

2. Inasmuch as the Board affirmed the "rulings, findings and conclusions of the Administrative Law Judge" without any significant change relevant to the review of the case by this court, the Decision of the Administrative Law Judge will herein be referred to as the Decision of the Board.

3. The Union involved in this case is the Teamsters "General" Local Union No. 200, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

4. The nine city drivers make deliveries within the city limits of Milwaukee, Wisconsin. The three over-the-road drivers handle interstate deliveries and pickups in Illinois and Wisconsin.

regarded the two groups of drivers as separate and there was "no way" the over-the-road operation would be allowed to "go union." Hawver was told by Gogin that before that happened the Company would fire the drivers, sell the trucks, and hire brokers to pull the freight. Hawver at this point told Gogin that he would not vote for the Union because of a past favor and asked what would happen to him if the over-the-road operations were eliminated. Hawver was told that he would be absorbed into the city driving operations. Hawver later changed his mind, and voted for the union. After that, on January 29, he was again questioned by Gogin as to whether he had signed an authorization card.

The Board found, based on these facts, that Gogin "coercively interrogated Scutchfield on January 23 and Hawver on January 23 [when Gogin told the men the Company] would close down its over-the-road operations before letting them go union. . . ."

■ An interrogation need not be explicitly threatening to be coercive within the meaning of Section 8(a)(1). *Satra Belarus, Inc. v. NLRB,* 568 F.2d 545 (7th Cir. 1978). "In order to determine accurately whether the interrogation would reasonably have been coercive, it must be viewed and interpreted as the employee must have understood the questioning and its ramifications. Interrogation, in order to offend the Act, must interfere with, restrain or coerce the employees . . . [or] tends to interfere with the free exercise of employee rights under the Act." *Hughes & Hatcher, Inc. v. N. L. R. B.,* 393 F.2d 557, 563 (6th Cir. 1968).

■ We believe the record demonstrates the presence of factors which justify the finding of coercive interrogation by the Company of these two employees.[5] First, noting the background of the company-union relations, the facts demonstrate that while the Company was not opposed to the unionization of the city drivers, it was adamantly opposed to the organization of the over-the-road drivers. Secondly, the employees here were stopped and questioned by the highest Company official. Also we note that in both instances the employee was in essence told not to engage in union activity or join the union. Further the information sought was whether an authorization card had been signed, which is the type of information "most useful for purposes of discrimination." *NLRB v. Milco, Inc.,* 388 F.2d 133, 137 (2d Cir. 1969). The *Satra Belarus, Inc.* court, *supra* at 548, has held that the Board may consider the nature of the information sought in relation to subsequent events. Here not only did the interrogation appear to be seeking information on which to base later action, but such action was in fact taken in connection with Hawver, only four days after the Company learned of his union activity.

■ The Company argues that its remarks to the men were nothing more than the legitimate prediction of a management decision, within the freedom of speech rights of an employer. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We note in response to this argument that the Court there also stated that such a "prediction must be carefully phrased on the basis of objective facts to convey . . . demonstrably probable consequences or . . . a management decision already arrived at. . . . If there is any implication that an employer may . . . take action solely on his own initiative for reasons unrelated to economic necessity . . . , the statement is . . . but a threat of retaliation . . . ." *Id.* at 618, 89 S.Ct. at 1942. The Company has not made any effort to show that it had any objective basis for believing that unionization would have the economic consequence of requiring the ter-

---

5. In *Satra Belarus, Inc., supra,* this court noted several factors that are relevant to a determination of whether an interrogation is coercive: (1) the background of employer-employee-union relations; (2) the nature of the information sought; (3) the questioner's identity; (4) the place and method of interrogation; and (5) the truthfulness of the reply. The Second Circuit in *NLRB v. Scoler's Inc.,* 466 F.2d 1289, 1291 (2d Cir. 1972), held that the presence of three was enough to support a finding of coercive interrogation.

mination of the over-the-road operation. The purpose and motivation of the statements by Gogin appear to be exactly that which is forbidden by the Act, for the purpose of chilling the unionization efforts of a portion of its employees.

■ Similarly, we also reject the Company's argument that the statement could not have been considered coercive by either Scutchfield or Hawver, since both were told they would still have jobs as city drivers.[6] However, the record does not show that the Company promised to save the jobs of all the over-the-road drivers, neither did it offer to continue the over-the-road wages to these employees, nor did it assure them that there would not be some other form of reprisal if they did join the union.

Under the circumstances of this case, the Board was warranted in finding that the statements made to employees Scutchfield and Hawver were coercive, and thus violative of Section 8(a)(1).

## II.

### Section 8(a)(3) Violations

■ The controlling principle behind the finding of a Section 8(a)(3) violation here is that the Company's action in discharging and laying off two employees was discriminatorily motivated. *Electri-Flex Co. v. NLRB,* 570 F.2d 1327 (7th Cir. 1978). Motivation is a question of fact to be determined by the Board from consideration of all the evidence and in making this determination the Board is free to rely on circumstantial, as well as direct evidence. *NLRB v. Murray Ohio Manufacturing Co.,* 358 F.2d 948, 950 (6th Cir. 1966). Further, while there must be substantial evidence on the record to support the decision of the Board, the decision is entitled to affirmance "even though this court would justifiably have made a different choice had the mat-

ter been before it *de novo.*" *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed.2d 456 (1957); *Electri-Flex Co. v. NLRB, supra,* at 1331. Applying the principles cited above to the facts of this case, we feel there is substantial evidence to support the findings of the Board that the discharge and the layoff were discriminatorily motivated.

Hawver had been employed by the Company since February, 1972, and was the most senior of the over-the-road drivers.[7] The Company had never expressed any dissatisfaction with Hawver's job performance, and the record reveals that he had received no disciplinary warnings during his term of employment. When Gogin first contacted Hawver regarding the unionization of the over-the-road drivers, and received assurances from Hawver that he would not support the union, Gogin told him that if it were necessary to eliminate over-the-road operations, Hawver would be transferred to the city operations. On January 29, Hawver was again questioned by his employer as to his union activities and at this time his employer found that he had changed his views and had signed a union authorization. Hawver was terminated four days later on February 2. In spite of his good employment record the Company contends that its sole reason, and a lawful motive, for discharging Hawver was the result of learning for the first time on January 30 that Hawver's conduct earlier in the month had displeased a customer resulting·in a loss of business.

■ An employer violates Section 8(a)(3) of the Act if the discharge of an employee is motivated,. even in part, by anti-union considerations. *Satra Belarus, Inc. v. NLRB, supra,* at 548. Prior conduct and anti-union animus reflected at the time of the discharge are "properly and highly significant factors" for the Board to con-

---

6. We also note that apparently Scutchfield did not consider city driving to be the equivalent of over-the-road driving since he had transferred from city driving. Also, Hawver was only told he would be transferred to city driving when Gogin thought he would not support the union. When the Company learned that Hawver had

changed his mind, its treatment of Hawver changed, see Section II, *infra.*

7. If both city and over-the-road driving time is combined, one employee had been there longer than Hawver.

sider in determining motive. *NLRB v. Tom Wood·Pontiac, Inc.,* 447 F.2d 383, 386 (7th Cir. 1971). The Board found that the Company learned of the incident when it first occurred, and later chose to use it as a pretext to discharge Hawver. The Company disputes the date it learned of the incident. However, *Universal Camera Corp., supra,* teaches that the matter is not before us *de novo,* and even though this Court may have made a different choice, if there is substantial evidence on the record as a whole, the finding of the Board is entitled to affirmance. The witness did testify that he notified the Company at the time the incident occurred. We also find it important that the Company failed to investigate the matter at all, whether it found out on January 14, or on January 30, and rather chose to terminate an employee who by all previous accounts was a valuable employee. Such inaction takes on increased significance since the record reveals that on January 29 the Company learned for the first time that Hawver had changed his mind and had voted for the union. The Company's anti-union animus in regard to its over-the-road drivers and its recent knowledge of the union support by this over-the-road driver are highly significant and probative factors in determining the motive behind the decision to terminate an employee based upon an uninvestigated report of misconduct.

Since we find substantial evidence on the record to support the Board's finding that the ground stated by the Company was only a pretext and that the discharge was motivated by impermissible anti-union discrimi-

nation in violation of Section 8(a)(3), we will not disturb that finding.

■■■■ With regard to the layoff of Laise, the record reveals that he was the leading adherent of the union.[8] While the Company did not object to the unionization efforts in regard to the city drivers, the efforts to organize the over-the-road drivers were strongly opposed by the Company. Laise's successful solicitation of Scutchfield on January 23, one of the over-the-road drivers, was witnessed by one of the Company supervisors. On January 29, the Company learned that another of its over-the-road drivers, Hawver, had joined the union. Within days Laise was informed that effective February 4 he was laid off "due to lack of business".[9] In addition to the anti-union animus, which we have already noted is highly relevant in determining whether a discriminatory motive prompted the action, the record reveals that length of service was stated as one of the criteria used in selecting men for the layoff. Laise was taken out of seniority order. Such conduct reveals the intent and motive of the employer. *NLRB v. Henry Colder Co.,* 416 F.2d 750, 753 (7th Cir. 1969).[10] The evidence pertaining to the recall of Laise reveals that when the Company regained the customer which had caused it to lay off two men, it only found it necessary to recall one of the laid off employees. Further, the first employee to be recalled was the employee with least seniority. Laise was not recalled until after charges had been filed with the Board. This disregard of seniority criteria in the recall, particularly in light of

---

**8.** Laise had been selected by the employees to contact the union. He obtained the authorization cards from the union and was contacting all the drivers, seeking their support for the union. He obtained authorization cards from 10 of the 12 drivers and returned them to the union on January 26. On January 27 the Company was contacted by the union demanding recognition since it represented a majority of the employees in the unit.

**9.** Due to the loss of business, caused by the temporary loss of the Pabst business, the Company laid off two men.

**10.** The Company argues that the other basis used for determining who was to be selected for the layoff, "all around ability to do the job" justified its action in laying off Laise, since he had had arguments with dispatchers, customers complained about his work, and he was unwilling to unload. Since we find that anti-union considerations were responsible for the Company's choosing Laise for the layoff, whether they had another legitimate basis would be immaterial to the finding of a Section 8(a)(3) violation. *Satra Belarus, Inc. v. NLRB, supra.* However, we note, as did the Board, that none of these alleged shortcomings were reflected in his personnel file.

the anti-union animus, is strongly indicative of a discriminatory motive.

We conclude that there is substantial evidence on the record as a whole to support the finding of the Board that the Company violated Section 8(a)(3) in its layoff and recall of Laise.

## III.

### Section 8(a)(5) and (1) Violations

#### A. *The Appropriate Unit*

■ Congress has expressly delegated the primary responsibility for determining the appropriateness of a unit for collective bargaining to the National Labor Relations Board. *State Farm Mutual Automobile Ins. Co. v. NLRB*, 411 F.2d 356, 358 (7th Cir. 1969) (en banc), *cert. denied*, 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83. *NLRB v. Chicago Health and Tennis Clubs, Inc.*, 567 F.2d 331 (7th Cir. 1977). The Board in the instant case found, contrary to the Company's contentions,[11] that the appropriate unit included both city and over-the-road drivers. The Board's determination will not be overturned unless it is arbitrary or unreasonable. *South Prairie Construction Co. v. Local No. 627, International Union*, 425 U.S. 800, 805, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); *State Farm Mutual Automobile Ins. Co. v. NLRB, supra*, at 358.

■ The Board found that the drivers as a group, both city and over-the-road, share a "substantial community of interest," in that they share similar terms and conditions of employment. They receive the same fringe benefits, they have similar skills, there is a degree of common supervision, and there is an interchange and transfer between drivers. All of these factors have been recognized as relevant in unit determinations.[12]

The Board, on the other hand, found that there was no compelling "community of interest" which required the inclusion of the mechanics and the drivers in the same unit. Rather the Board found that there was no similarity of skills, no transfer or exchange of duties, no common supervision, no similarity in conditions of employment, nor did they receive the same fringe benefits. All of these facts justify the Board's exclusion of the mechanics from the unit here[13] and its decision that mechanics need not be included with the drivers in order to secure an appropriate unit. See *NLRB v. Overland Hauling, Inc.*, 461 F.2d 944, 946 (5th Cir. 1972).

■ We conclude that the Board's determination that the appropriate bargaining unit included both the city and over-the-road drivers but did not include the mechanics or the part-time dispatcher[14] is

---

11. The Company argued before the Board, and now on appeal, that the appropriate bargaining unit should not include the over-the-road drivers but should include the mechanics and the part-time dispatcher.

12. Similar work functions, working conditions, and benefits: *Food Store Employees Union, Local 347 v. NLRB*, 137 U.S.App.D.C. 248, 255, 422 F.2d 685, 692 (1969); *Texas Pipe Line Co. v. NLRB*, 296 F.2d 208, 211 (5th Cir. 1961).
Common supervision: *NLRB v. Bayliss Trucking Corp.*, 432 F.2d 1025, 1028 (2d Cir. 1970).
Similar skills: *International Union, UAW v. NLRB*, 231 F.2d 237, 243 (7th Cir. 1956), *cert. denied*, 352 U.S. 908, 77 S.Ct. 146, 1 L.Ed.2d 117.
Employee interchange or transfer: *Howell Refining Co. v. NLRB*, 400 F.2d 213, 215 (5th Cir. 1968).

13. Different nature of work: *State Farm, supra*, 411 F.2d at 358. Different location of work: *State Farm, supra*; *NLRB v. Kostel Corp.*, 440 F.2d 347, 349–50 (7th Cir. 1971); *Wil-Kil Pest Control Co. v. NLRB*, 440 F.2d 371, 375 (7th Cir. 1971).
Lack of interchange: *NLRB v. Kostel Corp.*, 440 F.2d at 350; *Wil-Kil Pest Control Co. v. NLRB*, 440 F.2d at 375.
Separate supervision: *State Farm, supra*; *NLRB v. Winnebago Television Corp.*, 440 F.2d 369, 370–71 (7th Cir. 1971).
Different terms and conditions of employment: *NLRB v. Belcher Towing Co.*, 284 F.2d 118, 121, n.2 (5th Cir. 1960).

14. The Board found that the dispatcher was a "supervisor" and thus excluded from the bargaining unit. *NLRB v. Elliott-Williams Co.*, 345 F.2d 460, 463 (7th Cir. 1965). The Company does not dispute this finding.

supported by the evidence and is not arbitrary or unreasonable.[15]

B. *The Union's Majority Status*

The unit which the Board found appropriate for the bargaining unit consisted of twelve employees: eight city drivers, three over-the-road drivers, and one helper. When the union wrote to the Company on January 26, demanding recognition, it had obtained signed authorization cards from ten of these employees.[16]

The Company argues now, as it did before the Board, that the authorization cards were signed by the employees under duress and coercion, and therefore cannot be considered valid. Further, the Company argues that five of the authorization cards are invalid, since the purpose and effect of signing the card was misrepresented by Laise at the time of the solicitation.

■■■ The Company states that what occurred at the meeting of January 20 was in reality a form of coercion, in that the employees feared they would lose their jobs if they did not contact the union.[17] Furthermore, since the union had "input" into the decision of the customers who refused to do business with Gogin Trucking, this was in effect a union threat. The Board found that Gogin clearly indicated that he neither favored nor opposed the union, and that the choice was up to the employees. He made no threats or promises, nor did he solicit any employees to sign authorization cards. The Board also found that there was no background of union threats, since it was the customer, not the union, who had terminated business with the Company, and there was no showing that the union had exerted any unlawful pressure on the customer or coerced it to take action against

Gogin Trucking. After reviewing the record carefully, we find there is substantial evidence to support the conclusion reached by the Board, rejecting the Company's argument of coercion.

■■■ The Company's argument regarding the supposed misrepresentations made by Laise at the time of the solicitation of the authorization cards was similarly rejected by the Board, based on its credibility resolution of the witnesses. This court has consistently held that "it is the function of the Administrative Law Judge and the Board to make credibility determinations, not this Court." *NLRB v. Townhouse T.V. and Appliances, Inc.*, 531 F.2d 826, 829 (7th Cir. 1976). We do not here find any exceptional circumstances justifying a departure from that general rule.

Therefore, we conclude there was substantial evidence to support the finding of the Board that the Union represented a majority of the bargaining unit when it demanded recognition on January 26.

C. *The Granting and Withdrawal of Recognition*

The Board found that the Company granted recognition to the union in a telephone conversation on January 28 between the union representative, Fularczyk, and the Company's attorney, Hauer.

■■■ The Company claims that Hauer has not been shown to have the authority to represent the Company and therefore did not have the authority to recognize the union on behalf of the Company. The Company also argues that the Board should not have credited the testimony of the union representative over the testimony of the Company's witness. We believe the record supports a finding that Attorney Hauer

15. We find the variance between the unit requested by the union, "all drivers," and the unit found appropriate by the Board, "all drivers including helpers," which added one additional person to the unit, to be a minimal variance and insufficient to justify the Company's refusal to bargain. *NLRB v. Fosdal Electric*, 367 F.2d 784, 787 (7th Cir. 1966).

16. The helper did not sign the card. The card from one city driver was not introduced into evidence since it was not properly authenticated.

17. They were informed by Gogin that the Company had lost the customers because of its non-union status, and that if this loss of business continued, it could result in the loss of jobs as well.

was an agent of the Company. During the period in question, he was acting as attorney for the Company and was the only attorney representing it. He was the person to contact the union in response to the union's letter demanding recognition and represented himself as an agent of the Company, and the union was never informed that he lacked such authority. Under these circumstances, it was proper for the Board to find that he was an agent of the Company.

■ The Company asks this court to disturb the findings of the Board in crediting the testimony of Fularczyk over that of attorney Hauer. We decline to do so on the basis that absent exceptional circumstances, such resolutions are within the province of the trier of fact, and will not be disturbed on review. *Sarkes Tarsian, Inc. v. NLRB*, 374 F.2d 734, 736 (7th Cir. 1967). However, we intend no adverse reflection upon counsel whatsoever.

■ The Board found that the Company refused to bargain with the union and withdrew recognition of the union, and by this action violated Sections 8(a)(5) and (1) of the Act. The Company argues that it was relieved of its obligation to bargain with the union, because a majority of the employees who had signed the union authorization cards in January repudiated their action in April. The Board found that this action did not relieve the Company of its duty to bargain, and that the Company could not use this action as a basis to refuse to recognize the union, since it occurred in the circumstances of, and could not be disassociated from, the Company's unfair labor practices. We agree with this finding by the Board. In *NLRB v. Montgomery Ward and Co.*, 399 F.2d 409 (7th Cir. 1968), this court held that an employer could not withdraw recognition until the union had had a "reasonable opportunity to prove itself" as the employees bargaining representative. Here the union had no opportunity at all, since the Company never bargained. A particularly important reason for this rule, as noted by the court in *Montgomery Ward, supra*, at 412, is to preclude the possibility

that by "stalling the negotiation process [the employer] may be able to undermine the union strength." It is important in the instant case to note that the alleged repudiation came after a period when the employer refused to bargain, and during this very same period the employer committed unfair labor practices, suggesting that its behavior enabled it to undermine the union. Under the circumstances of this case, we feel the Board properly concluded that the Company was not able to rely on the employee's action to excuse its illegal behavior and by its refusal to bargain and its withdrawal of recognition violated Sections 8(a)(5) and (1) of the Act.

Accordingly we enforce the Decision and Order of the National Labor Relations Board.

ENFORCED.