**JUSTAK BROTHERS AND COMPANY, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Laborers Local Union 41, Laborers International Union of North America, and State of Indiana District Council, Laborers International Union of North America, Party Respondents.**

No. 81–1132.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1981.

Decided Nov. 25, 1981.

Griffin B. Bell, Jr., Atlanta, Ga., for petitioner.

James Y. Callear, N. L. R. B., Washington, D. C., for respondent.

Before SWYGERT, Senior Circuit Judge, and SPRECHER and BAUER, Circuit Judges.

SWYGERT, Senior Circuit Judge.

Justak Brothers and Company, Inc. (hereinafter "the Company") has petitioned this court for review of an order of the National Labor Relations Board (hereinafter "the Board") pursuant to section 10(f) of the National Labor Relations Act, *as amended*, 29 U.S.C. §§ 151 *et seq.* (hereinafter "the Act"), 29 U.S.C. § 160(f). The Board has cross-applied for enforcement of its order pursuant to section 10(e) of the Act. Laborers Local Union 41, Laborers International Union of North America (hereinafter "the Union") intervened in this proceeding.

The Company supplies casual labor and vacuum truck waste removal services to industrial plants. Its work force consists of office employees, mechanics and mechanics' helpers, truck drivers, and laborers. In June 1979 the Union began an organizing campaign among the Company's laborers and truck drivers. On July 2 the Union filed a petition with the Board seeking an election at the Company. On July 12 the Company received the Union's request for bargaining. On July 23 the Union filed an unfair labor practice charge against the Company.

On September 28 the Board issued a complaint alleging that the Company (1) violated section 8(a)(1) by threatening and interrogating employees, promising and granting benefits to employees, and creating an impression of surveillance; (2) violated sections 8(a)(3) and (1) by discharging three employees; and (3) violated sections 8(a)(5) and (1) by refusing to bargain with the Union. After a hearing in December the Administrative Law Judge issued a decision on June 30, 1980 that sustained the allegations. On January 7, 1981 the Board affirmed the Administrative Law Judge's findings and conclusions. It adopted the recommended order that included the issuance of a *Gissel*-type bargaining order. The Company then filed this petition for review.

We review three issues. First, whether there is substantial evidence on the record as a whole to support the Board's finding that the Company violated section 8(a)(1) of the Act by restraining *the* coercing employees in the exercise of their section 7 rights. Second, whether there is substantial evidence on the record as a whole to support the Board's finding that the Company violated sections 8(a)(3) and (1) of the Act by discharging three employees because of their union activities. Third, whether the Board abused its discretion in finding a bargaining order necessary to remedy the Company's violations of sections 8(a)(5) and (1) of the Act of refusing to recognize and bargain with the Union.

### I. The Independent Section 8(a)(1) Violations

The Company does not challenge the independent section 8(a)(1) violations. The provisions of the Board's order relating to these violations, therefore, are enforced. A

discussion of these unfair labor practices is necessary, however, because their scope and nature are important factors in determining whether the Board properly issued a bargaining order. (*See* section III *infra*.)

In June 1979 the Union began an organizing campaign among the Company's laborers and truck drivers. On June 26 the Union held an organizational meeting where many of the Company's employees presented signed authorization cards to the Union representatives.

The Company's section 8(a)(1) violations began the next day. All of the Company's management, from owner Gary Justak to lower level supervisors,[1] committed these unfair labor practices. The violations fall into six categories: (1) threatening employees with discharge or layoff; (2) threatening employees with investigations and deportations by Immigration and Naturalization Service authorities; (3) creating the impression of surveillance of union activities; (4) interrogating employees about union activities; (5) promising better wages and medical coverage to thwart union organization; and (6) actually granting wage increases to thwart union organization.

II. Sections 8(a)(3) and 8(a)(1) Violations

A. Applicable Law

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate against an employee "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." An employer violates section 8(a)(3) when it discharges an employee because of his union activities.

■ The critical issue in a section 8(a)(3) claim is whether the employer's actions were motivated by anti-union considerations. *NLRB v. Gogin*, 575 F.2d 596, 601 (7th Cir. 1978); *Jay's Foods, Inc. v. NLRB*, 573 F.2d 438, 443 (7th Cir. 1978), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). Because motive is rarely open

to direct proof, it is "to be determined by the Board from consideration of all the evidence and in making its determination the Board is free to rely on circumstantial, as well as direct evidence." *NLRB v. Gogin*, 575 F.2d at 601.

■ This court recently approved the Board's refinement of the analysis used to determine the causal relationship between the employee's protected activities and the employer's action. *Peavey Co. v. NLRB*, 648 F.2d 460 (7th Cir. 1981). Under this analysis:

> The General Counsel must first make a *prima facie* showing that the employee's protected conduct was a motivating factor in the employer's decision to discharge the employee. Once this is established, the burden shifts to the employer to demonstrate that he would have discharged the employee even in the absence of the protected conduct.

*Peavey Co. v. NLRB*, 648 F.2d at 461 (7th Cir. 1981). *See Statler Industries, Inc. v. NLRB*, 644 F.2d 902, 905 (1st Cir. 1981). If a causal relationship between the discharge and the protected activity is shown then the employer is liable unless he sustains his burden of proof. Furthermore, an employer's explanation need not be accepted if there is a reasonable basis for believing it "furnished the excuse rather than the reason for [an employer's] retaliatory action." *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965).

As noted, Company officials made numerous unlawful threats of discharge, layoff, plant shutdown, and deportation as soon as they became aware of the Union's organizational campaign. (*See* section I *supra*.) This court has held repeatedly that the employer's conduct and anti-union animus are significant factors in determining motive. *NLRB v. Gogin*, 575 F.2d 596, 601–02; *NLRB v. Tom Wood Pontiac, Inc.*, 447 F.2d 383, 386 (7th Cir. 1971); *NLRB v. Bedford Nugent Corp.*, 379 F.2d 528, 529 (7th Cir. 1967).

---

1. For a discussion of the supervisory status of the Company's "leadmen," *see* section III, *infra*.

Finally, this court "may not displace the Board's choice between two fairly conflicting views [of the evidence], even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). *See W. W. Grainger, Inc. v. NLRB*, 582 F.2d 1118, 1120–21 (7th Cir. 1978). We will not pass on the credibility of witnesses, reweigh the evidence, or reject reasonable Board inferences simply because other inferences might also be reasonably drawn. *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962).

## B. Illegal Discharges

On the morning of June 28, three truck drivers—Thomas Waugaman, David Clousing, and Eric Myers—signed union authorization cards. Waugaman and Clousing also solicited cards from other drivers.

### 1. Waugaman's discharge

The Company threatened to discharge Thomas Waugaman. Justak (the owner) told him, "You may get a union in here but you will not be here." Kritch told Clousing that Waugaman "was on his way out." On June 29, the day before Waugaman's alleged misconduct that was the ostensible basis for his discharge, Kritch told Waugaman that he would try to "get him" for work related infractions.

On June 30, the Company asserts that Waugaman failed to respond when paged. The credited testimony shows, however, that: (1) Waugaman was called in and worked most of Saturday; (2) he was told he could leave by the job site supervisor; (3) the supervisor said that he would telephone the Company and have Waugaman paged if he was needed further; and (4) Waugaman was not paged that day to return to the job site.

The Company relies on discredited testimony without showing exceptional circumstances that warrant overturning the Administrative Law Judge's credibility resolutions. *See NLRB v. Pittsburgh S. S. Co.*, 337 U.S. 656, 659–60, 69 S.Ct. 1283, 1285–86, 93 L.Ed. 1602 (1949); *Electri-Flex Co. v. NLRB*, 570 F.2d 1327, 1331–32 (7th Cir. 1978), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256. For example, the Company claims that Waugaman lied to the job site supervisor on June 30 by telling him that his shift had ended. The Company, however, never called the supervisor as a witness to rebut Waugaman's uncontradicted testimony that the supervisor told Waugaman he could leave. *Cf. International Union, UAW v. NLRB*, 459 F.2d 1329, 1336–39 (D.C.Cir.1972).

The Board's finding that Waugaman was discharged for anti-union reasons had substantial support in the record.

### 2. Clousing's discharge

Clousing too was threatened. He was warned of a plant shutdown, told he was being fired for soliciting cards, and rehired on the condition he destroy the cards that he had in his possession.

On June 28, the day Clousing was observed soliciting authorization cards, the Company inserted a warning in his personnel file for taking an overly-long lunch break. The credited testimony, however, shows that Clousing did not take a one-hour lunch break, was never told of the purported infraction and was never shown the warning. On July 2 the Company issued another warning to Clousing for arriving late for work. The credited evidence shows, however, that Clousing actually arrived at work early that day when he drove Myers to work. Moreover, as with the June 28 warning, Clousing was never told of the infraction or shown the warning.

Three weeks later the Company discharged Clousing. The Company asserts that Clousing quit voluntarily. The credited evidence shows, however, that Clousing was actually discharged because of his pro-Union activities.

We repeat that a reviewing court generally will not overturn the Administrative Law Judge's credibility resolutions. *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 405, 82

S.Ct. 853, 854, 7 L.Ed.2d 829 (1962). The Administrative Law Judge based credibility findings on the demeanor of the witnesses and on the inconsistencies in the testimony of Kritch and Justak. Kritch gave three different versions of Clousing's discharge, while Justak gave yet another. Clousing, on the other hand, testified consistently about the events surrounding his discharge. Furthermore, as noted, the two warnings in Clousing's file are suspicious. We see no basis for overturning the Administrative Law Judge's credibility resolutions or the inferences drawn therefrom.

The Company asserts further that it would have justifiably discharged Clousing because he falsely told the Company that he missed work on July 24 because he had to take a sick child to the doctor. This contention lacks merit. The Company has contended all along that Clousing was not discharged. It was only after the Company's evidence was discredited that it argued that it would have discharged Clousing for lying. The evidence shows overwhelmingly that the Company suspected that Clousing was at the union hall on the day in question and that this suspicion was the actual reason for his discharge. In these circumstances Clousing's misconduct is no defense for the Company.

### 3. Myers' discharge

The Company discharged a third truck driver, Eric Myers, who had signed an authorization card on June 28.

The Company asserts that it discharged Myers for failing to answer a second beeper while enroute to the Company and for taking too long to report to the yard after the first page. The credited evidence shows, however, that Myers was not paged a second time. Moreover, Myers told Justak when he responded to the first page that it would take him a while to come in, and Justak replied, "That's OK . . . . Make it as soon as you can." Once again, we are presented with no basis for overturning the Administrative Law Judge's credibility resolutions.

Moreover, even if Myers' testimony is not believed, there is no credible evidence showing that his conduct was treated uniformly by the Company as a dischargeable offense. The record does not support the Company's contention that it had a consistently-applied policy of automatic termination for beeper violations. Moreover, witnesses did not testify that truck drivers were told to answer a page within a specific time or that they were told to stay within a specific distance from the Company.

The Board's order relating to all section 8(a)(3) violations is enforced.

### III. Sections 8(a)(5) and (1) Violations

### A. The Appropriate Unit

The Company contends that the Board erred in including certain employees in the unit and in excluding others. Congress has delegated the primary responsibility for determining the appropriateness of a collective bargaining unit to the Board. *NLRB v. Gogin*, 575 F.2d 596, 603 (7th Cir. 1978); *State Farm Mutual Automobile Ins. Co. v. NLRB*, 411 F.2d 356, 358 (7th Cir.), *cert. denied*, 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83 (1969). Its determination will not be overturned unless it is arbitrary and unreasonable. *South Prairie Construction Co. v. Local No. 627, Int'l Union*, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976); *NLRB v. Gogin*, 575 F.2d at 603.

### 1. The J. B. Sanitation Employees

The Board found that there was no "community of interest" requiring the inclusion of the J. B. employees in the unit. The Board noted that the J. B. employees had separate supervisors, performed different tasks, and drove different trucks than the Company's drivers. Moreover, there were no transfer or exchange of duties, no common supervisors, and no similarity in pay structure. These findings justify the Board's exclusion of the J. B. employees from the bargaining unit. *NLRB v. Gogin*, 575 F.2d at 603 nn. 13 and 14.

### 2. Part-time Employees

The Board excluded Ruth Hicks, James Lampa, Timothy King, and Joseph

Nowak from the unit because of the irregular nature of their part-time employment. Part-time employees may be included in a bargaining unit with full-time employees if the part-time employees work regularly. *NLRB v. Economy Food Center, Inc.*, 333 F.2d 468, 471 (7th Cir. 1964). The Board found, however, that these four individuals were employed only on a sporadic and intermittent basis. The exclusion of these employees from the bargaining unit is justified.

### 3. Francisco Arredondo, Silverio Gonzalez, Jesus Sanchez, and Sergio Herrada

■ The Company challenges the inclusion of these four employees in the unit because their personnel files reveal that they left the Company to return to Mexico. As the Board noted, however, all these employees were working for the Company on the July 12 demand date, had been working for at least four months previously, and continued to work for at least a month afterwards. There was no evidence showing that these employees were hired to work only until a definite termination date. The Board's inclusion of Arredondo, Gonzalez, Sanchez, and Herrada in the bargaining unit is justified.

### 4. Supervisory status

■ One of the Board's special functions is to determine whether a person is an "employee" or a "supervisor" within the meaning of the Act. This court has noted that the Board is entitled to a "large measure of informed discretion" in carrying out this task. *Dynamic Machine Co. v. NLRB*, 552 F.2d 1195, 1201 (7th Cir.), *cert. denied*, 434 U.S. 827, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977).

The Board excluded Parks, Vrabel, Godines, and Simko from the bargaining unit because they were supervisors. Their employment contracts designated the four as foremen; they wore hats distinguishing them from laborers; and their pay scale was more than twice that of the laborers. Their job functions were supervisory—they assigned work, directed employees to their jobs, checked employees' performances, sent employees home, and transferred employees between jobs. These findings justify the Board's designation of these men as supervisors. *NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 727–29 (7th Cir. 1977); *Dynamic Machine Co. v. NLRB*, 552 F.2d at 1200–01.

The Board included Enrique Miranda and Pedro Moreno in the bargaining unit because they were not supervisors. The two men were paid less than the leadmen, were designated laborers in their employment records, and did a laborer's work. These findings justify the inclusion of Miranda and Moreno in the bargaining unit.

The Board's determinations on the scope of the bargaining unit are upheld.

### B. The Union's Majority

Seventy-nine employees were in the bargaining unit on July 12 when the Company received the Union's request for bargaining. The Union had received authorization cards from 42 of these employees. The Company challenges the validity of several of the cards.

■ The Company challenges Thomas Waugaman's card because of the alleged misinformation given him by Union representatives as to the purpose of the cards. Where the terms on the card are unambiguous, however, it must be counted unless a union adherent deliberately and clearly cancels its meaning. *NLRB v. Gissel Packing Co.*, 395 U.S. 575 at 606, 89 S.Ct. 1918, 1936, 23 L.Ed.2d 547; *Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503, 507 (7th Cir. 1980). The terms of the card here are clear, and there is no evidence of a deliberate cancellation.

■ The Company challenges Ancelmo Acosta's card because there is no evidence that anyone explained its meaning to him. The record shows he signed the card and turned it in at the June 26 organizational meeting. At this meeting the Union had employees interpreting in Spanish the remarks of the Union representatives. This challenge, therefore, lacks merit.

The Company also challenges Carillo's, Gonzalez's, and Samarron's cards because of their alleged inability to understand English. There was no evidence in the record, however, indicating that these employees spoke only Spanish.

The Company challenges the cards of Altamirano, Moreno, and Martinez because the Company payroll records show that they began work on June 26 at 8:00 A.M., worked 11½ hours, and so could not have attended the organizational meeting. Substantial evidence in the record, however, showed that the Union meeting lasted as long as three hours (beginning at 5 or 5:30 p.m.) and that the card signing occurred at the end of the meeting. These cards were properly counted. *NLRB v. Philamon Labs, Inc.*, 298 F.2d 176, 180 (2d Cir.), *cert. denied*, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962).

 Finally, the Company challenges the card of Felix Campos because his pretrial affidavit was admitted to authenticate his card. Campos's affidavit states that he attended the June 26 meeting and he authorized another employee to sign his name to his authorization card. The Company challenges the admissibility of this affidavit under Rule 804 of the Federal Rules of Evidence.

The Administrative Law Judge gave reasons justifying the affidavit's admission. Campos was unavailable because he could not be found. His affidavit had probative value because it explained the difference between the signatures on the authorization card and his W–4 form. The affidavit was given under oath—a person who willfully lies is subject to criminal penalties. The affidavit, therefore, had "equivalent guarantees of trustworthiness." *See Copperweld Steel Co. v. Demag-Mannesmann-Bohler*, 578 F.2d 953, 963–64 (3d Cir. 1978); *United States v. Lyon*, 567 F.2d 777, 784 (8th Cir.), *cert. denied*, 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1977). Finally, there

was adequate notice because as soon as the General Counsel learned that Campos was unavailable, he informed the Company that he would introduce the affidavit. *United States v. Bailey*, 581 F.2d 341, 348 (3d Cir. 1978).

## C. Bargaining order

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court upheld the Board's authority to issue bargaining orders on the basis of authorization cards whenever the employer has committed unfair labor practices that had "the tendency to undermine majority strength and impede the election process." 395 U.S. at 614, 89 S.Ct. at 1940. The determination of the appropriateness of a bargaining order is, like all remedies, entrusted to the sound discretion of the Board.

 This court has required the Board to give reasons that justify its use of the bargaining order remedy. *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1118 (7th Cir. 1973). The purpose of this requirement is to permit the court to perform its task of judicial review. *Id.* at 1119; *Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503, 509 (7th Cir. 1980). The requirement, therefore, must be understood in light of this purpose.[2] It is meant neither to burden the Board nor to curtail the issuance of bargaining orders. *Hedstrom v. NLRB*, 629 F.2d 305, 309 (3d Cir. 1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981). Elaborate explanations are not essential; indeed, scientific accuracy in estimating the impact of unfair labor practices is impossible. Rather, we only require that the Board delineate the factors that it considers in its estimation, and describe how these factors have been weighed. *See* 484 F.2d at 1118, n.16. In this case the Board identified and discussed the unfair labor practices it relied upon, noted their tendency to undermine the Union's majori-

---

2. For example, even if the Board fails to justify its issuance of a bargaining order, as long as the record is clear this court may review it and affirm or deny the issuance of the order. *Wal-* *green Co. v. NLRB*, 509 F.2d 1014, 1018 (7th Cir. 1975); *C&W Super Markets, Inc. v. NLRB*, 581 F.2d 618, 625–26 (7th Cir. 1978).

ty—especially in regards to their lingering effects—and evaluated the adequacy of traditional remedies. Nothing more is necessary.

■ Once the Board has spelled out the basis for its issuance of a bargaining order, this court's review is limited to whether the Board abused its discretion. The Board noted that from the very start of the Union's organizing campaign, the Company engaged in a systematic campaign of unfair labor practices designed to destroy the Union's support. (*See* sections I and II, *supra.*) These unfair labor practices were committed by almost all the Company's supervisors, including its highest corporate official. Moreover, the Company has made no effort to neutralize the effect of its threats of layoff, discharge, shutdown, and deportation. Common sense recognizes the dramatic and long term effects of such threats. *NLRB v. Gissel Packing Co.*, 395 U.S. at 587–89, 615, 619–20, 89 S.Ct. at 1926–27, 1940, 1942–43; *NLRB v. Jamaica Towing Co., Inc.*, 632 F.2d 208, 212–13 (2d Cir. 1980); *Bandag v. NLRB*, 583 F.2d 765, 772 (5th Cir. 1978).

■ The Board considered and rejected traditional remedies. The probable impact of unfair labor practices is increased when a small bargaining unit is involved. *NLRB v. Bighorn Beverage*, 614 F.2d 1238, 1243 (9th Cir. 1980); *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 168 (3d Cir. 1977). The Company's violations are not minor. It engaged in surveillance of Union activities, discharged pro-Union employees, threatened layoffs and immigration investigation, and both promised and granted benefits to thwart unionization. Threats were not only made but executed. ("Actions speak louder than words," as the administrative law judge noted.) Under such circumstances, and after a careful review of the record, we fully agree with the Board that a bargaining order is an appropriate remedy.

■ The Company maintains that its employee turnover shows the inappropriateness of the bargaining order. It is well settled, however, that the Board may issue a bargaining order even if the Union represents only a minority when the order is entered. *Gissel*, 395 U.S. at 610, 89 S.Ct. at 1938. If we were to accept the Company's contention, an employer could engage in a scheme of unfair labor practices and yet escape a bargaining order by delaying and waiting for employee turnover. *NLRB v. L. B. Foster Co.*, 418 F.2d 1, 5 (9th Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970); *Chromalloy Mining and Minerals v. NLRB*, 620 F.2d 1120, 1132–33 (5th Cir. 1980). We cannot allow this perversion of the Act's purpose. It is important to recall, as the Supreme Court has noted, that the issuance of a bargaining order in the *Gissel*-type circumstances promotes employee free choice because the Union must have obtained a majority of cards to obtain the bargaining order. *Gissel*, 395 U.S. at 614, 89 S.Ct. at 1940. To allow employee turnover to defeat the issuance of a bargaining order, therefore, would undermine employee free choice. Employee turnover should not be a controlling factor.

IV

The order of the National Labor Relations Board is enforced.