FIRST LAKEWOOD ASSOCIATES, limited partnership, Second Lakewood Associates, limited partnership, Fifth Lakewood Associates, limited partnership, and Sixth Lakewood Associates, limited partnership, and Entrust Management Company, an Illinois Corporation, joint employers, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 77–1914.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1978.

Decided Aug. 9, 1978.

K. Bruce Stickler, Chicago, Ill., for petitioner.

Norman A. Moscowitz, N. L. R. B., Washington, D. C., for respondent.

Before PELL and WOOD, Circuit Judges, and SOLOMON,* Senior District Judge.

PELL, Circuit Judge.

This is a petition for review and cross-application for enforcement of a decision and order of the National Labor Relations Board (Board) which held that the employer in this case violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act (Act). The Board ordered the employer to cease and desist from the unfair labor practices it was found to have committed and, in addition, after a finding that the employer's violations made a fair election unlikely, ordered it to bargain with Janitors Union Local 1 (union).

The employer owns and manages an apartment building and townhouse complex where it employs a number of janitorial workers. On December 5, 1975, the union held an organizing meeting with these workers and obtained signed authorization cards from six of the employees in the unit. One other employee in the unit was already a member of the union. On December 8, 1975 a union organizer advised Thomas Holmes, the employer's Property Manager, that the union represented a majority of the employer's janitorial employees and requested recognition and bargaining. Holmes responded that he had nothing to do with union matters, and that the appropriate person with whom to speak was Vice-President Allen. It is at this time that the unfair labor practices commenced.

### The Section 8(a)(1) Violations

The Board found that the employer violated § 8(a)(1)[1] by interrogating employees

---

* Senior District Judge Gus J. Solomon of the District of Oregon is sitting by designation.

1. Section 8(a)(1) prohibits an employer from interfering, coercing, or restraining employees in the exercise of their Section 7 rights to organize, bargain collectively, and engage in peaceful concerted activities. 29 U.S.C. § 158(a)(1).

concerning their union activities, threatening employees with deprivation of benefits if the union should be selected to represent them, threatening an employee with discharge for refusing to reveal the identities of employees who attended a union meeting, creating the impression that its employees' union activities were under its surveillance, informing an employee that it knew (or heard) that the employee had joined the union, and promising to pay and paying employees for certain medical benefits to discourage them from supporting the union. The employer argues that there is not substantial evidence on the record considered as a whole to support the Board's conclusion. *Universal Camera Corp. v. N.L. R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1957). We now view that evidence in some detail.

## A. Interrogations

On December 8, 1975, after the union had first requested recognition, maintenance supervisor Lynn Mehrholz telephoned employee Gregory Tomek at his home and asked if any union people had contacted him. Tomek replied that none had. The next morning Mehrholz entered the maintenance office where the janitorial employees reported for work and asked employee Arley Canterbury, "What has the union done for you?" Canterbury did not reply. Mehrholz then entered his own office and called in employee Theodore Ervin. Mehrholz told Ervin that he knew that the employees had brought in an organizer and wanted to organize a union. He then asked Ervin if he attended the meeting and if he knew who sent for the organizer. When Ervin denied attending the meeting and any knowledge about who sent for the organizer, Mehrholz repeated the questions and concluded by telling Ervin not to sign anything or talk to any organizer and to keep him informed of any such activities.

On the evening of December 9, 1975 Mehrholz again telephoned Tomek and asked whether he had spoken to any union people. Tomek admitted that he had, but refused to offer any further information. Mehrholz continued to question him about why he was doing this and who attended the meeting. That same evening Mehrholz telephoned George Green, another employee, and asked why he had not told him about the union meeting. Green denied knowledge of the meeting. Mehrholz then telephoned Ervin and again asked who brought in the organizer. He repeatedly attempted to elicit this information, but Ervin said he did not know. Mehrholz ended the conversation by telling Ervin to keep his ears and eyes open and to let him know if he heard anything. He also told him not to sign anything.

Mehrholz continued these interrogations on December 10, 1975. That morning he called Andrew Hogue, an employee, into his office and asked, "So you want to join the union, huh?" Hogue responded, "Who told you that?" Mehrholz said, "The union man." Hogue then left, and Mehrholz called in Curt Snelten and asked him if he had joined the union. Snelten responded that it was none of his business. Mehrholz told him that he just wanted him to know that there were no hard feelings and that he would probably do the same thing if he were in Snelten's position.

During the second week of December 1975 Mehrholz asked employee Michael Stein if he knew anything about "this union stuff." Stein replied that he did not.

These facts clearly constitute substantial evidence on the record considered as a whole to support the Board's conclusion that the employer violated § 8(a)(1). Employer interrogation of employees concerning union activities is not per se coercive under § 8(a)(1). *Satra Belarus, Inc. v. N.L. R.B.*, 568 F.2d 545 at 547 (7th Cir. 1978). The proper analysis, however, is whether the interrogation reasonably would have been coercive when viewed and interpreted as the employee must have understood the questioning and its ramifications. *N.L.R.B. v. Gogin*, 575 F.2d 596 at 600 (7th Cir. 1978). Accordingly, the circumstances of the inter-

rogations are critical to a determination of whether they violated § 8(a)(1). We have noted several factors that are relevant to such a determination: (1) the background of employer-employee-union relations; (2) the nature of the information sought; (3) the questioner's identity; (4) the place and method of interrogation; and (5) the truthfulness of the reply. *Id.* at 600 n.5. *See also N.L.R.B. v. Pope Maintenance Corp.,* 573 F.2d 898, 904 (5th Cir. 1978). Although these factors provide some guidance, they are not exclusive and thus we must consider all relevant circumstances in making our determination.

An important characteristic of the interrogations in this case is that they were made without any accompanying explicit explanation for the employer's interest in the union's activities. Moreover, to the extent that Mehrholz intimated reasons for the employer's concern, it was that the employer did not want a union and wanted to know who was behind the organizational drive. Mehrholz's persistent questioning with respect to the identity of those employees responsible for the initiation of the union's organizational attempt and those expressing support for the union, absent a persuasive, explicit, legitimate explanation, could reasonably suggest to the employees that the underlying reason for the questioning was to segregate the union supporters for future reprisals. Most of the interrogated employees denied knowledge of the union meeting, denied knowledge of who attended the meeting, or denied personal support for the union, a strong indication that they feared reprisals.

■ We also note that Mehrholz, the questioner, was a supervisor and was perceived as an agent of the employer. His alliance with the employer and his anti-union posture were readily apparent to the employees and thus heightened the coercive nature of his questioning and diminished

the likelihood of the employees perceiving his questions as casual, isolated, or the product of friendly discussion. *See. B. F. Goodrich Footwear Co.,* 201 N.L.R.B. 353 (1973). Under these circumstances the Board was warranted in finding that the interrogations were coercive and violative of § 8(a)(1).[2]

The employer argues that any interference or coercion Mehrholz's conduct may have had would have dissipated by January 30, 1976, the date of the representation election, because the employer terminated Mehrholz on December 24, 1975. Mehrholz's termination, however, was unrelated to his anti-union conduct, and there is no evidence in the record that the employees perceived his termination as an indication of the employer's disapproval of that conduct. Moreover, Mehrholz was replaced by Neill who engaged to some degree in similar conduct violative of § 8(a)(1). The employer's suggestion that the impact of Mehrholz's illegal conduct would totally evaporate at his termination is, therefore, unpersuasive.

## B. Threats

On December 9, 1975, when Mehrholz telephoned Tomek and interrogated him concerning the union, Tomek admitted that he had talked to some union people, but refused to answer any further questions. After several unsuccessful attempts to elicit additional information during that conversation, Mehrholz said to Tomek, "You are either on my side of the fence or your side of the fence . . . You always had it good. I have given you—you got a nice job, you got an apartment . . . . This is your last chance." When Tomek still refused to answer, Mehrholz said, "I'll make you feel the shit of the earth," and then hung up.

On January 30, 1976, the morning of the election, Supervisor Ray Neill told employee

---

**2.** It is immaterial under our standard of review that we might regard the coercive impact of these interrogations as distinctly on the mild side. Thus Snelten responded on one occasion that it was none of Mehrholz's business, scarcely the response of an intimidated employee. Mehrholz in reply indicated what could certainly be said to be understanding of the union organizational drive, if not personal approval. Nevertheless, we will not substitute in this area our judgment for that of the Board.

Snelten that if the union won the election the employer would take the rent-free apartments away from the janitors' helpers and charge the head janitors for the second bedroom in their apartments.

As to Mehrholz's December 9 statements to Tomek, the employer argues that they did not constitute a § 8(a)(1) violation because they did not imply that Tomek's job was in jeopardy and because Tomek's subsequent conduct indicated that he was not intimidated by the statements. We disagree both with the inferences the employer draws from the statements and with the legal standard it applies to those inferences. The Board could find a reasonable interpretation of Mehrholz's statements to be that Tomek's job was less secure after the conversation than before. More importantly, however, a threat violative of § 8(a)(1) need not be directly to job security. Statements that reasonably induce fear that the employee will be treated less favorably on the job are often sufficient to constitute a § 8(a)(1) violation. Furthermore, we disagree with the employer's argument that Tomek's subsequent conduct proved that he was not coerced by Mehrholz's statements. The employer submits that because Tomek accompanied another employee when that employee met with Vice-President Allen to discuss company benefits, Tomek was not coerced by Mehrholz's statements. This conduct does not categorically prove absence of coercion. Moreover, the Board's finding of a § 8(a)(1) violation is not conditioned on proof of actual coercion. The General Counsel need only show that the employer's actions would tend to coerce a reasonable employee and the Board so found.

Under this standard, the Board was also warranted in finding Supervisor Neill's threat on January 30 to be a § 8(a)(1) violation. The employer argues that the administrative law judge (ALJ) erroneously credited Snelten's version of the January 30 incident instead of Neill's version. Credibility determinations of the ALJ are entitled to considerable weight, and if the Board accepts such determina-

tions, we will not upset them unless the disputed testimony shows on its face that it is beyond credibility. *See Certain-Teed Products Corp. v. N.L.R.B.*, 562 F.2d 500, 505 (7th Cir. 1977). We, therefore, accept Snelten's version of the January 30 conversation.

The employer argues alternatively that even if Snelten's version is accepted, Neill's statement did not constitute a violation because Neill was merely making a prediction as to the precise effects that he believed unionization would have on the company. This argument implicitly invokes the interrelationship between § 8(c) and § 8(a)(1). Section 8(c) provides that the expression of any views, argument, or opinion shall not be evidence of an unfair labor practice so long as such expression contains no threat of reprisal or force or promise of benefit in violation of § 8(a)(1). 29 U.S.C. § 158(c). The employer's argument derives from the Supreme Court's construction of § 8(c) in *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969) (hereinafter *Gissel*), in which the Court stated that an employer "may even make a prediction as to the precise effects he believes unionization will have on his company." The Court, however, in the same paragraph, limited the scope of an employer's legitimate communications.

> In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at . . . .. If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion . . . ..

*Id.* The Board could properly find that Neill's statements to Snelten did not fall within this narrow category of predictions carefully phrased on the basis of objective

fact and thus constituted threats in violation of § 8(a)(1).

## C. Surveillance of Union Activities

█ The Board found that the employer created the impression of surveillance of union activities in violation of § 8(a)(1). When Mehrholz interrogated Hogue on December 10, 1975, he asked, "So you want to join the union, huh?" Hogue responded, "Who told you that?" to which Mehrholz replied, "The union man." Similarly, on December 9, 1975, Mehrholz asked Green why Green had not told him about the union. These questions, viewed in their context, provide substantial evidence to support the Board's finding that the employer created the impression of surveillance of union activities in violation of § 8(a)(1). *See N.L.R.B. v. Long Island Airport Limousine Service Corp.,* 468 F.2d 292, 296–97 (2d Cir. 1972).

## D. Promise of and Granting of Benefits

█ The Board found that the employer did not have a policy covering miscarriage and maternity medical expenses incurred by its janitorial employees, but that after the union requested recognition, the employer promised to pay and did pay for these expenses. Although the evidence to support this finding is scarcely overwhelming, it is sufficient, under our standard of review. Having accepted this factual finding, the conclusion that the employer thus violated § 8(a)(1) follows accordingly. The law is clear that § 8(a)(1) prohibits employer conduct "immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *N.L.R.B. v. Exchange Parts Co.,* 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). The Board was warranted in finding that the employer promised and granted benefits for the purpose of discouraging union support. The inference that the employer's purpose was to discourage unionization is supported by the fact that the payment of benefits temporally accompanied the union organizational campaign and

by the employer's other conduct with relation to the campaign. *See N.L.R.B. v. South Shore Hospital,* 571 F.2d 677, 681 (1st Cir. 1978); *N.L.R.B. v. Frantz and Company,* 361 F.2d 180, 182 (7th Cir. 1966).

## The Bargaining Order

On January 30, 1976, the union lost the representation election 6 to 4. The Board, however, found that the employer's numerous unfair labor practices dissipated the union's majority status as established by the authorization cards, and that these violations were so serious and pervasive that they made a fair rerun election unlikely. The Board, therefore, ordered the employer to bargain and stated that the employer's bargaining obligation arose as of December 8, 1975, the date the union demanded recognition and the date the employer began its course of illegal conduct. *Trading Port, Inc.,* 219 N.L.R.B. 298 (1975). The employer's refusal to bargain since that date and its institution of unilateral changes in wages, hours, and terms and conditions of employment after that date were found to be violations of § 8(a)(5).

█ Our analysis of the propriety of the bargaining order makes a separate discussion of the § 8(a)(5) charges unnecessary. In *Gissel, supra,* the Court outlined the types of cases in which the Board could consider the extraordinary remedy of the bargaining order. Such an order could issue in the " 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices." *Id.,* 395 U.S. at 613–14, 89 S.Ct. at 1940. In these cases a bargaining order could issue in the absence of a § 8(a)(5) violation. The present case, however, is clearly not within this category, and indeed, the Board does not argue that it is. Instead, the Board argues that this case falls within the second category of cases characterized by "less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." *Id.,* at 614, 89 S.Ct. at 1940. The authority to issue a bargaining order in these cases depends on whether the union had a valid card majority. There-

fore, as Judge Cummings reasoned for this court in *Peerless of America, Inc. v. N.L. R.B.*, 484 F.2d 1108, 1115 (7th Cir. 1973) (hereinafter *Peerless*):

> Since the Company was entitled to reject the Union's recognition demand regardless of its subjective motivation, whether or not the Company violated Section 8(a)(5) likewise depends upon whether the Union had a valid card majority when it made its demand and upon whether the Company engaged in " 'contemporaneous unfair labor practices likely to destroy the union's majority status and seriously impede the election.' " . . . Thus it seems that in this case the determination of whether a Section 8(a)(5) violation has been committed involves the same inquiry as whether a bargaining order can properly issue.

[Footnotes and citations omitted.]

Turning to the propriety of the bargaining order in the present case, the employer argues that it was improperly granted because the General Counsel failed to prove that the union had a valid card majority, the Board failed to make specific findings as to the immediate and residual impact of the unfair labor practices on the election process, and the unfair labor practices did not reach the level of severity necessary to merit a bargaining order under the *Gissel* standards. We will address these arguments *seriatim.*

The ALJ found that a bargaining order was not warranted because the evidence failed to establish the total number of employees in the unit making a determination of majority status impossible. The Board, however, found that on December 8, 1975, the date the union demanded recognition, eleven employees were in the unit, seven of whom had designated the union as their collective bargaining representative by signing authorization cards. The employer argues, consistently with the ALJ, that the evidence is devoid of proof as to the total number of employees in the unit on Decem-

ber 8. We agree that *Gissel* requires proof that the union had a valid card majority. Our task, however, is to determine whether the Board's finding that it is supported by substantial evidence.

The Board, the ALJ, and the employer analyze the issue of majority status as of December 8, the date the union demanded recognition.[3] We agree with the employer and the ALJ that the evidence does not, even under our standard of review support a finding of majority status on that date. The Board relies on the testimony of Neill in which he named employees in the unit in December 1975. The Board omits the fact that the question eliciting this testimony specified the time frame as "on or about December 15." As additional support the Board states that Neill testified that the identity of the maintenance and janitorial employees has remained constant. This characterization of his testimony is inaccurate. Neill testified that job classifications did not change; he said nothing about changes in the identity or number of employees within the job classifications.

■ The absence of sufficient evidence of majority status on December 8, however, is not dispositive. *Gissel* does not condition the issuance of a bargaining order on proof of a card majority on the date of the union's demand for recognition. *Gissel* requires only that "there is also a showing that *at one point* the union had a majority." *Gissel, supra,* 395 U.S. at 614, 89 S.Ct. at 1940 (emphasis added). A bargaining order may serve to remedy employer coercion under § 8(a)(1), and thus it is not necessary that the employer be found independently to have violated § 8(a)(5) by rejecting a formal union demand for recognition at a time when the union had a valid card majority. As we are of the opinion that there is substantial evidence to support the existence of a valid card majority "on or about December 15," the bargaining order in this case will not be denied enforcement for

---

**3.** The employer argued that the demand for recognition did not occur until December 9 when the union contacted Vice-President Allen.

We disagree. The union's request on December 8 was sufficient.

failure to satisfy this requirement of *Gissel*.[4]

The employer next argues that the Board failed to make the specific findings required to support a bargaining order. This court has consistently interpreted *Gissel* to require the Board to

> make "specific findings" as to the immediate and residual impact of the unfair labor practices on the election process and that the Board must make "a detailed analysis" assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring misconduct, and the potential effectiveness of ordinary remedies.

*Peerless, supra* at 1118, and cases cited therein. *Peerless* thoroughly explained what is expected and indeed what is required of the Board.

> [B]y "specific findings" in this regard we hardly mean that the Board must determine how many employees actually were caused to abandon the Union. We mean only that it estimate the impact, taking into account the factors in the particular case which are indicative of actual effect or which plausibly, in the light of existing knowledge, would contribute to or detract from an actual impact. This is, after all, what the courts which have made their own analyses have done. Similarly the "detailed analysis" of the likelihood of recurring misconduct and of the potential curative effect of ordinary remedies only requires an appraisal of those factors which might reasonably have a bearing, such as whether the employer has a history of anti-union animus and Labor Act violations, whether the employer has taken affirmative rectifying measures or otherwise indicated his cooperativeness in assuring a fair election, etc.

*Id.* at 1118 n. 16. By these standards, the Board's findings in the present case are inadequate. The ALJ's decision contains no *Gissel* findings because the ALJ, having found that the General Counsel failed to prove a valid card majority, never reached the issue. The Board's decision contains only the following discussion regarding the appropriateness of a *Gissel* order.

> We find that these unlawful activities, which began at the time the Union demanded recognition and continued throughout the critical period, had the effect of dissipating the Union's majority status as established by authorization cards. The numerous instances of unlawful actions created an atmosphere hostile to the Union and its adherents. Moreover, all of Respondent's employees, with the possible exception of Marie Harle, were targets of the unlawful conduct. We find that Respondent's serious and pervasive violations of the Act make a fair election unlikely and require a bargaining order as of December 8, 1975, the date of the Union's demand for recognition.

231 N.L.R.B. No. 68 at 3.

The Board's conclusion that the employer's serious and pervasive violations make a fair election unlikely is unsupported by specific findings. Even if we assume *arguendo* that the employer's violations which do not strike us as serious and pervasive were in fact so, the Board is silent as to their future impact, if any, and as to whether the facts suggest that the employer's conduct is likely to recur. The Board also fails to evaluate the potential effectiveness of ordinary remedies. The Board's cavalier treatment of necessary *Gissel* findings in this case, its "substitution of conclusion for explanation does not permit a reviewing court to do its job." *Peerless, supra* at 1119.

Rather than remanding to the Board for additional findings, and because we are of

---

4. The § 8(a)(5) violation accordingly could not have begun until "on or about December 15." This raises the issue of whether the employer could have violated § 8(a)(5) beginning at this time without a contemporaneous demand for recognition by the union. Resolution of this issue might require a determination of whether

the union's December 8 demand was of a continuing nature. *See Local No. 152 v. N.L.R.B.*, 120 U.S.App.D.C. 25, 343 F.2d 307 (1965). We need not reach the issue, however, because we hold, *infra*, that the bargaining order was inappropriate and thus the § 8(a)(5) violation fails under the same analysis.

**424**

the opinion that additional findings would not permit us to enforce this bargaining order, we shall analyze the propriety of the bargaining order and thereby avoid needless delay. *See Walgreen Co. v. N.L.R.B.,* 509 F.2d 1014, 1018–19 (7th Cir. 1975).

The § 8(a)(1) violations in this case did not, in our opinion, have a significant impact on employee voting sentiments, and any initial impact will have dissipated prior to the next election, especially if the Board's ordinary remedies of a cease and desist order and a posted notice intervene. All but a very few of the § 8(a)(1) violations resulted from interrogations and threats made by Mehrholz who was terminated almost six weeks before the representation election. As we noted *supra,* Mehrholz's termination did not preclude a finding of § 8(a)(1) violations, but it did nevertheless diminish the residual nature of that coercion. The lingering effects of coercive conduct are less likely to be sustained with much vigor if the person directly responsible for that conduct has long departed and his replacement has engaged in only a few isolated coercive acts.[5]

Furthermore, the record does not reflect a workforce suffering from the residual impact of coercive conduct. For example, on January 22, 1976, two employees met with Vice-President Allen for about three hours and openly discussed company benefits and, more significantly, issues raised by the union campaign. At least one of these employees had been subject to Mehrholz's § 8(a)(1) conduct prior to this meeting, yet neither employee apparently felt the need to disavow any union sympathies, an indication of the ephemeral nature of the impact of the unfair labor practices. The record does not suggest that the impact of the unfair labor practices on the other employees was any greater. *See Shulman's Inc. of*

*Norfolk v. N.L.R.B.,* 519 F.2d 498 (4th Cir. 1975).

As to the likelihood that the employer's misconduct will recur, the record is barren of such indications. The record does not suggest that the employer has had a history of anti-union animus, and the record indicated no reason to think that the employer will ignore the Board's cease and desist order.

In sum, we are of the opinion that the extraordinary remedy of a bargaining order in this case was both unnecessary and improper, and that a new election will more effectively promote the policy of employee free choice.[6] We, therefore, set aside and deny enforcement of the decision and order as to bargaining and the § 8(a)(5) violations and direct that the notice be modified accordingly. The remainder of the Board's order is ordered enforced.

---

**5.** When the employer misconduct is confined to § 8(a)(1) violations, the likelihood that a *Gissel* bargaining order is appropriate is decreased. We do not suggest that in all cases § 8(a)(1) violations are less serious and have less residual impact than other unfair labor practices such as § 8(a)(3) violations, but generally this is so. Accordingly, when reviewing a bargaining order issued solely on the basis of § 8(a)(1) violations, the need for specific findings as outlined

in *Peerless* is heightened. *Cf. Hedstrom Co. v. N.L.R.B.,* 558 F.2d 1137, 1152 (3d Cir. 1977); *N.L.R.B. v. Townhouse T.V. & Appliances, Inc.,* 531 F.2d 826, 830 (7th Cir. 1976).

**6.** The Supreme Court has stated that the election process is superior to reliance on authorization cards. *N.L.R.B. v. Gissel Packing Co., supra,* 395 U.S. at 603, 89 S.Ct. 1918.