**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BERGER TRANSFER & STORAGE CO., Respondent,**

and

**Truck Drivers, Oil Drivers, Filling and Platform Workers Union, Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Intervenor.**

No. 81–1239.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 6, 1981.

Decided May 13, 1982.

Rehearing and Rehearing En Banc Denied Oct. 5, 1982.

Penny A. Pilzer, N.L.R.B., Washington, D. C., for petitioner.

Stuart H. Brody, Sherman Carmell, Carmell, Charone & Widmer, Ltd., Chicago, Ill., for intervenor.

Robert L. Grossman, Delaney, Thompson & Solum, Minneapolis, Minn., for respondent.

Before BAUER and CUDAHY, Circuit Judges, and BAKER, District Judge.*

BAKER, District Judge.

The National Labor Relations Board (the "Board") has petitioned the court to enforce the Board's order finding the respondent Berger Transfer & Storage, Inc. (The "Company") guilty of unfair labor practices and directing the Company to bargain with the intervenor, Truck Drivers, Oil Drivers, Filling and Platform Workers Union, Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (The "Union"). The Company has cross-applied for review.

Four questions are presented for review:

(1) Did the Administrative Law Judge (the "ALJ") articulate sufficient reasons for his credibility determinations?

(2) Does the record support the findings concerning the supervisory status of employees Jerry Gocha and James Stang?

(3) Does the record support the findings of numerous unfair labor practices?

(4) Did the Board properly issue a *Gissel* bargaining order?

We answer each of the questions in the affirmative and enforce the Board's order.

The Company operates a national moving and transfer business. In May and June of

---

* The Honorable Harold A. Baker, District Judge of the Central District of Illinois sitting by des-

ignation.

1979, the Company operated a warehouse at Lombard, Illinois, and employed approximately forty drivers, warehousemen and helpers. At the times in question, Karl Maierhofer was the general manager of the terminal and Mark Harris was the operations manager.

On Monday, May 21, and Wednesday, May 23, 1979, Union business agents Jerry Rzewnicki and William Dicks went to the Lombard warehouse and spoke with a number of employees concerning the benefits of unionization. The agents gave the interested employees authorization cards, which they filled out and signed in the presence of Rzewnicki and Dicks and returned to the agents. As a result, the Union possessed signed cards from a majority of employees.[1]

On May 21, the Company general manager, Karl Maierhofer, and the operations manager, Mark Harris, noticed the Company employees talking to Rzewnicki and Dicks and saw the employees signing cards. Maierhofer and Harris knew of rumors that the Union sought to organize the employees.

As operations manager, Harris made daily work assignments from a list of about twenty-five employees arranged in order of seniority. Harris would give a copy of the assignment list to warehouse foreman Jerry Gocha, who ensured that trucks were loaded and that designated drivers were properly dispatched. On May 21 Harris assigned work to the seventeen senior-most employees, and gave no work to those with less seniority. When an employee asked why there was no work available for those with less seniority, Harris replied that, "with all the union stuff going on, he was not going to use everyone." Appendix for Appellants at 4. Also that day, general manager Maierhofer told a warehouse employee that, if there was a union at the warehouse, there would be less work and smaller crews, and that those with less seniority would lose their jobs. Maierhofer later asked two other employees why the employees were organizing and who among the employees wanted to unionize. During that conversation, Maierhofer made notes on a list of Company employees.

On the same afternoon, Harris and James Stang, a sales representative who held himself forth as a vice-president in charge of sales of the Company, asked several employees why they wanted a union. Stang persisted in asking what a union could do for the employees that the Company could not do. Harris and Stang told the employees that, if a union came in, they would reduce work by not booking any jobs on Mondays and Tuesdays.

On the following day, Tuesday, May 22, the Company posted a list assigning work to sixteen employees and providing no work for about fifteen of the listed employees.

On May 23, Rzewnicki met Maierhofer, identified himself, handed Maierhofer the signed authorization cards, presented Maierhofer with a Recognition Agreement, and asked him to sign it. Maierhofer refused to sign the Agreement, took the Union cards, and went inside his office. Two hours later, Maierhofer returned the cards to the Union.

At about 8:30 AM the Union began to picket the warehouse premises for recognition of the Union. At about 10:30 AM Maierhofer and Harris summoned a number of picketers and told them that they would be terminated and their insurance would be cancelled if they did not return to work by 11:00 AM. Shortly after the meeting, the Union changed its picket signs to protest unfair labor practices. On May 23 the Company sent telegrams to its employees telling them to return to work or the Company would consider that the employees had voluntarily terminated their employment along with their hospitalization coverage. Appendix for Appellants at 7.

On the afternoon of May 23 the employees formed a picket line across the driveway

---

1. The agents obtained 28 signed cards. The Company and General Counsel for the Board stipulated that 39 employees were part of an appropriate bargaining unit at the time in question, disputing only the eligibility of card signers Koontz, Morris and Gocha, whose inclusion would bring the total to 42.

entrance at a point which intersected Grace Street, a public right-of-way. At that time, Harris was required to deliver a piece of machinery to a customer of the Company in one of the Company trucks. As the truck passed out of the driveway and through the picket line, Harris applied the truck's brakes in order to avoid an oncoming automobile on Grace Street. In the course of braking, the truck "fishtailed" and the rear hit the picketer, Terry Most, knocking him into the picketer, Frank Gocha. Harris did not stop but continued on his way. Harris later told employee Overton that Harris had hit the picketers both "intentionally" and "unintentionally."

On the evening of May 23, Company Vice-President Frank Goodwin, who worked at the Company's facility in Dallas, Texas, telephoned two of the striking employees, Overton and Frank Gatz. Goodwin asked both Overton and Gatz why the workers were out on strike, whether something could be worked out with the employees if Goodwin flew back to Chicago for a meeting, and who the organizers of the union effort were, suggesting it might be employees Roesecke and York. Overton told Goodwin that things had gone too far for a meeting and that he was prepared to support the union effort even if it meant losing his job. Goodwin replied that while Overton would not lose his job, employees at the bottom of the seniority list might lose their jobs.

On the following day, Maierhofer summoned Roesecke, York, Redmond, and Richard Way from the immediate vicinity of the picket line and asked them why they were trying to organize and " '[w]hy are you doing this to me?" Appendix for Appellants at 8.

On May 24 at about 2:00 PM Company President William Dircks telephoned Overton to ask who was responsible for the organizing effort, and whether he and Overton could meet to talk the matter out. When Overton told Dircks no, because he wanted the grievance procedure and job security that union organization would provide, Dircks suggested that the Company might set up a grievance procedure similar to the one provided for in the Union contract. Overton said no, "that he was willing to go all the way with the Union even if it meant getting fired. Dircks said, '[t]hat's just what will happen,' and adding that he would not be strongarmed into recognizing the union." Appendix for Appellants at 9.

Late in the afternoon of the same day, Harris initiated a meeting with York, Roesecke, and Overton. Harris told the employees that if they continued with the Union organization and the strike the Company would close the warehouse, send the equipment to the Minnesota headquarters, and turn its accounts over to another company.

On Sunday afternoon, May 27, Company Vice-President Goodwin and his wife were back in the Chicago area and paid a social call on York. During the course of their conversations, Goodwin asked York why the employees wanted the union. Goodwin wanted to know if Phil Roesecke was one of the instigators and whether the top man in the organizing campaign would meet with Dircks and discuss their differences.

On Monday afternoon, May 28, the Company sent a telegram which informed the employees that the telegram of May 23 was sent without authority and that the employees' jobs were available.

On June 6, at about 2:30 PM, two men who worked for the Company, Charles Voelker and James Miller, attempted to leave the Company premises in Harris' pickup truck, but decided not to cross the picket line. Instead, they parked Harris' truck in the Company parking lot and went into the office. Miller and Harris then emerged and got into Harris' pickup truck. The ALJ found testimony credible that Harris drove the truck toward the picket line and " 'floored' his accelerator and, in the process of crossing the line struck Gatz and Mundt who were picketing." Appendix for Appellants at 10.

On June 15 the picketing ended. Most of the employees returned to work on June 18. On the first day of work following the strike, Harris informed Gocha that he

would no longer be warehouse foreman and placed Gocha's name about twenty-third on the seniority list, with the result that Gocha rarely worked a forty hour week.

### I. *THE ALJ'S CREDIBILITY DETERMINATIONS.*

The Board adopted the rulings, findings and conclusions of the ALJ, including those regarding credibility. The Board found "no basis on the record in this proceeding for reversing [the ALJ's] credibility determinations or his findings of fact thereon" and that the allegations of bias and prejudice on the part of the ALJ were "totally without merit." Appendix for Appellant at 40 n.1. We agree.

■ Credibility determinations, including assessments of demeanor, are to be made by the ALJ and the Board, and will not be overturned by a reviewing court absent extraordinary circumstances. *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613 (7th Cir. 1981); *NLRB v. Mars Sales & Equipment Co.*, 626 F.2d 567 (7th Cir. 1980); *Medline Industries, Inc. v. NLRB*, 593 F.2d 788 (7th Cir. 1979); *Electri-Flex Co. v. NLRB*, 570 F.2d 1327 (7th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978). In the recent case of *Kopack v. NLRB*, 668 F.2d 946 (7th Cir. 1982), this court elaborated on the proper scope of reviewing "credibility" determinations. To the extent that the ALJ's decision rests explicitly on his evaluation of demeanor, the Board and a reviewing court are required to "weigh those particular findings more heavily." *Id.* at 954. Moreover, explicit credibility findings are unnecessary when the ALJ implicitly resolves conflicts in testimony as evidence by findings of fact which are supported by the record as a whole. *Electri-Flex Co. v. NLRB*, 570 F.2d 1327 (7th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978). As pointed out in *Medline Industries, Inc. v. NLRB*, 593 F.2d 788, 795 (7th Cir. 1979), absent a clear showing of bias, the court will uphold credibility determinations by an ALJ unless there is a "complete disregard for sworn testimony, coupled with

a tongue in cheek characterization of those utterances." Bias is not conclusively established merely because an ALJ uniformly credits one party's witnesses over another's. The record fails to substantiate a clear showing of bias or the discrediting of uncontroverted testimony. Therefore, we concur in the findings of the Board.

### II. *SUPERVISORY STATUS OF JERRY GOCHA AND JAMES STANG.*

■ The Company seeks review of the Board's findings regarding the supervisory status of Jerry Gocha and James Stang. In determining who is included within a defined term in the Act, the Board is accorded a substantial amount of discretion. *American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893 (7th Cir. 1981). It is also well established that the Board shall be affirmed in its determinations if the Board's findings are supported by substantial evidence. If, when so viewed in its entirety, the record contains " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " we must accept the Board's findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)), *quoted in American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 894–95 (7th Cir. 1981). Section 2(11) of the Act defines supervisor as:

> [A]ny individual having authority in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11) (1976). Only one of the criteria mentioned in section 2(11) need be present to find supervisor status. *Southern Indiana Gas & Electric Co. v. NLRB*, 657 F.2d 878, 883 (7th Cir. 1981); *American*

*Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 896 (7th Cir. 1981). Applying these guidelines to the status of Jerry Gocha and James Stang, we agree that Gocha is an employee whereas Stang is a supervisor.

(A) Jerry Gocha.

▆▆ The Board found that Jerry Gocha was not a supervisor and therefore was protected by the Act when he was demoted. In making its findings, the Board held that despite the title of "warehouse foreman" Gocha's testimony established that he had "no power to discipline . . . no role to play in grievances . . . did not hire or fire or recommend that anyone be hired or fired . . . did not assign particular employees . . . [and did not exercise] the use of independent judgment." Appendix for Appellant at 12. Although there was testimony by Harris that Gocha sent at least two employees home for disciplinary reasons (Brief for Respondent at 11, citing T. 673–75), and that Gocha would adjust minor employee grievances on a daily basis (Brief for Respondent at 11, citing T. 676), this testimony was within the province of the ALJ and the Board to accept or reject. Even accepting the testimony of Harris, incidental and extraordinary exceptions to an employee's regular practice should not control the ALJ's determinations. *NLRB v. Orr Iron, Inc.*, 508 F.2d 1305 (7th Cir. 1975).

In *Orr*, employee Collins was assigned as night shift foreman. As night foreman, he was not included in supervisory meetings nor given the authority to recommend or affect actions involving wages, hiring, suspension, discipline, layoff, recall, transfer, assignment, granting of time off, or adjustment of grievances. However, on one occasion Collins spoke with superintendent Simpson about the poor attendance of another employee, and on another occasion told one of the steel handlers to do his work or go home. Finding that the "primary responsibility" of Collins was to get the trucks loaded, this court held that the other occasions were "incidental and extraordinary exceptions to Collins' regular practice, and when looked at against the total background do not in any way show that Collins

had the authority to discipline or recommend the discipline of employees as one of his regular functions." *Id.* at 1307.

In the present case there is substantial evidence to support the Board's finding that the primary responsibility of Gocha was to see that the "trucks were properly loaded and that employees left with the trucks to which they were assigned." Appendix for Appellant at 12.

(B) James Stang.

▆▆ The Board found that the statements made by James Stang on May 21 were properly attributable to the Company because of (1) his supervisor status or, (2) the implicit ratification of his statements by Harris. Appendix for Appellant at 12. In making its finding, the Board noted that Stang (1) advertised himself to customers and to Company employees as a vice-president of the Company, (2) occasionally interviewed applicants for positions and made recommendations as to their employment, and (3) occasionally attended managerial meetings. Applying the analysis of *NLRB v. Orr Iron, Inc.*, 508 F.2d 1305 (7th Cir. 1975), to the duties of Stang, the findings of the Board seem insufficient to conclude that Stang was a supervisor. However, an employee's actions may be imputed to his company regardless of supervisory status where the company places an employee in a position which reasonably fosters the appearance and belief that he acts on behalf of the management. *NLRB v. Broyhill Co.*, 514 F.2d 655, 656 n.5 (8th Cir. 1975); *see generally American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 896–971 (7th Cir. 1981); *Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503, 506 (7th Cir. 1980). Additionally, the Board found evidence to support the finding that the Company, through its manager Harris, ratified the statements of Stang. Given the liberal interpretation of the principles of agency in labor cases, 29 U.S.C. § 152(13), "if there is a connection between management and the employee's actions, either by way of instigation, direction, approval, or at the very least acquiescence, then the acts of the employee

will be imputed to the company." *NLRB v. Dayton Motels, Inc.,* 474 F.2d 328, 331 (6th Cir. 1973); *see generally Red Oaks Nursing Home, Inc. v. NLRB,* 633 F.2d 502 (7th Cir. 1980); *Boyles Famous Corned Beef Co. v. NLRB,* 400 F.2d 154 (8th Cir. 1968). Under these alternatives, there was sufficient evidence in the record to find the Company responsible for the statements of Stang.

### III. SECTIONS 8(A)(1), (3), AND (5) VIOLATIONS.

The Board adopted the ALJ's findings and conclusions that the Company had violated sections 8(a)(1), (3), and (5) of the Act. These findings must be enforced if they are supported by substantial evidence based upon the record as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613 (7th Cir. 1981).

### (A) Section 8(a)(1) Violations.

The Board found the Company had committed eighteen independent 8(a)(1) violations which can be divided into six basic categories: (1) interrogating employees about union activities; (2) threatening employees with discharge, layoff and plant closure; (3) creating the impression of surveillance; (4) making promises to redress employees' complaints; (5) assaulting employees; and (6) actual layoff and discharge of employees.

Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their rights to organize and bargain collectively through representatives of their own choosing. 29 U.S.C. § 158(a)(1) (1976). The test of interference with the right of self-organization is not whether an attempt at coercion has succeeded or failed, but whether the employer engaged in conduct which reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their section 7 rights. *Jays Foods, Inc. v. NLRB,* 573 F.2d 438 (7th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978).

(1) Interrogation of employees.

Section 8(a)(1) does not prohibit all employer questioning of employees about union activities. However, when the questions asked "viewed and interpreted as the employee must have understood the questioning and its ramifications, could reasonably coerce or intimidate the employee with regard to union activities," a violation has been established. *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 624 (7th Cir. 1981). An analysis of the employer's conduct should consider, *inter alia:* (1) the background of the employer-employee relationship; (2) the questioner's identity; (3) the nature of the information sought; (4) the place and method of the interrogation; and (5) the truthfulness of the reply. *Id.; First Lakewood Associates v. NLRB,* 582 F.2d 416 (7th Cir. 1978).

The record is replete with conversations initiated by management and directed towards employees regarding the union drive. Shortly after observing employees sign cards on May 21, General Manager Maierhofer, the highest Company official in Lombard, questioned employee Frank Gatz about the union drive. A similar conversation was initiated later on that day when Maierhofer asked employees Gary Wallen and Dennis Busse what had prompted the situation, whether they had signed cards, and who the instigators were. On the same afternoon, Manager Harris and James Stang initiated conversations with employees Larry York and Phil Roesecke. The following day, Maierhofer asked Gerry Stroh why the employees were interested in joining a union. On the morning of May 23, Harris called employee Overton into his office and asked what was going on, whether the employees were planning a strike, and if so whether Overton would participate.

On May 23, the employees went on strike. Questioning continued, this time by the upper echelon of the Company management. On the evening of May 23, Vice-President Goodwin telephoned employees Overton and Gatz at their homes inquiring as to the

reasons for persons behind the union drive. The next day, Company President Dircks called Overton with the same line of questioning. Several days later, during the course of a social visit, Goodwin questioned employee York about the Union activities.

■ Applying the considerations outlined in *First Lakewood Associates v. NLRB*, 582 F.2d 416 (7th Cir. 1978), it is apparent that the findings of the Board are supported by substantial evidence. As stated in *First Lakewood* :

> An important characterization of the interrogations in this case is that they were made without any accompanying explicit explanation for the employer's interest in the union's activities. Moreover, to the extent that Mehrholz intimated reasons for the employer's concern, it was that the employer did not want a union and wanted to know who was behind the organizational drive. [The] ... questioning with respect to the identity of those employees responsible for the initiation of the union's organizational attempt and those expressing support for the union, absent a persuasive, explicit, legitimate explanation, could reasonably suggest to the employees that the underlying reason for the questioning was to *segregate the union supporters for future reprisals.*

582 F.2d at 419 (emphasis added). In addition, it is noteworthy that the questioners were high ranking personnel. Given this, and the obvious anti-union animus, the interrogations as perceived by the employees could appear coercive as opposed to casual, isolated, or friendly. The fact that employees were not actually inhibited does not obviate the 8(a)(1) violation. *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1115 (7th Cir. 1973). Therefore, the Board's finding should be upheld.

(2) Threats to close the plant, discharge and layoff employees.

■ An employer violates section 8(a)(1) when he threatens employees with reprisals or other unfavorable consequences as a result of their union activities. *NLRB v.* *Lucy Ellen Candy Div. of F & F Laboratories, Inc.*, 517 F.2d 551, 553 (7th Cir. 1975). Here the evidence shows that the Company began a campaign of threatened reprisals immediately following the Union's organizational drive. In particular, the Company: (1) informed the employees that if the Union succeeded there would be less work, smaller crews; (2) told the employees that no work would be booked for Mondays and Tuesdays; (3) emphasized that layoffs would be controlled by seniority; (4) threatened to discharge employees if they continued to participate in the strike; and (5) threatened to close the warehouse if employees continued to support the Union. Appendix for Appellant at 14–17.

■ Threats to cut back available work in response to employees' exercise of their section 7 rights are classic section 8(a)(1) violations, *NLRB v. Gogin*, 575 F.2d 596, 601 (7th Cir. 1978), as are threats to discharge those employees, *Borek Motor Sales, Inc. v. NLRB*, 425 F.2d 677 (7th Cir.), *cert. denied*, 400 U.S. 823, 91 S.Ct. 45, 27 L.Ed.2d 52 (1970).

■ Whether or not threats of plant closure are threats or predictions of the economic consequences of union organization, which fall outside the ambit of section 8(a)(1), turn on the nature of the employer's statement. An employer's prediction:

> must be carefully phrased on the basis of objective facts to convey ... demonstrably probable consequences beyond his control or ... a management decision already arrived at .... If there is any implication that an employer may ... take action solely on his own initiative for reasons unrelated to economic necessity ... the statement is ... but a threat of retaliation....

*NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969), *quoted in NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 623 (7th Cir. 1981). Here the Company failed to articulate any objective facts to support its "prediction" that the unionization would have dire economic consequences. Instead the record supports the finding that the em-

ployees understood the message as a threat of reprisal.

(3) Impressions of surveillance.

An employer violates section 8(a)(1) when it conveys to employees the impression that it is engaged in surveillance of their union activities. *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613 (7th Cir. 1981). Here the Company: (1) made it known to employees that the Company was aware of employees signing authorization cards, (2) made notes on a list of employees during an interrogation, and (3) suggested that York and Roesecke were the instigators. This course of conduct supports the Board's finding that the Company violated section 8(a)(1) by creating an impression of surveillance.

(4) Solicitation of grievances, implied promises or redress.

An employer violates section 8(a)(1) of the Act by soliciting grievances when such solicitation is " 'accompanied by an express or implied promise of benefits specifically aimed at interfering with, restraining, and coercing employees in their organizational effort.' " *NLRB v. Tom Wood Pontiac, Inc.*, 447 F.2d 383, 384–85 (7th Cir. 1971) (quoting ITT Telecommunications, 183 N.L.R.B. No. 115, at 3 (1970)). Here the Company repeatedly approached employees to determine how differences could be reconciled. On one occasion, Vice-President Goodwin told employee Overton that the Company would give him "basically the same thing" as the Union, and suggested a meeting with the "top guys." Such employer initiated conduct supports a finding that the Company violated section 8(a)(1) by soliciting grievances and impliedly promising redress.

(5) Assaults.

The evidence shows that on two occasions, Manager Harris recklessly drove his truck through the picket line. Appendix for Appellant at 15, 17. The first incident occurred on May 23, when Harris drove a Company truck through the picket line striking picketers Most and Gocha. He

later stated that he hit the picketers both "intentionally and unintentionally." A similar incident occurred on June 6. Although there was testimony that the picketers were inebriated and blocking the Company driveway on that occasion, the Board found that the assaults were connected to the employees' union activity. Considering the active anti-union stand taken by the Company as evidenced in the record, there is substantial support for the Board's finding.

(B) Section 8(a)(3) Violations—Layoffs, Demotions & Discharges.

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate against an employee "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(1) (1976). For example, an employer violates section 8(a)(3) when it discharges an employee because of his union activities. *Justak Brothers and Co., Inc. v. NLRB*, 664 F.2d 1074 (7th Cir. 1981).

The critical issue in a section 8(a)(3) claim is whether the employer's actions are motivated by anti-union considerations. *Justak Brothers and Co., Inc. v. NLRB*, 664 F.2d 1074 (7th Cir. 1981); *NLRB v. Gogin*, 575 F.2d 596 (7th Cir. 1978); *Jays Foods, Inc. v. NLRB*, 573 F.2d 438 (7th Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). In applying this analysis:

The General Counsel must first make a *prima facie* showing that the employee's protected conduct was a motivating factor in the employer's decision to discharge the employee. Once this is established, the burden shifts to the employer to demonstrate that he would have discharged the employee even in the absence of the protected conduct.

*Justak*, 664 F.2d at 1077 (quoting *Peavey Co. v. NLRB*, 648 F.2d 460, 461 (7th Cir. 1981)). If a causal relationship between the discharge and protected activity is established, the employer is responsible under the

Act unless he sustains his burden of proof. Furthermore, an employer's explanation need not be accepted if there is a reasonable basis for believing the explanation is a pretext for the retaliatory action. *Justak*, 664 F.2d at 1077 (citing *NLRB v. Thor Power Tool Co.*, 351 F.2d 584 (7th Cir. 1965)).

■ The evidence shows that Company officials made numerous unlawful threats of discharge, layoff, plant shutdown, together with unlawful interrogations, solicitation of grievances, promises of redress and assaults. Such conduct is a significant factor in determining motive. *Justak*, 664 F.2d at 1077; *NLRB v. Gogin*, 575 F.2d 596, 601–02 (7th Cir. 1978); *NLRB v. Tom Wood Pontiac, Inc.*, 447 F.2d 383, 386 (7th Cir. 1971); *NLRB v. Bedford Nugent Corp.*, 379 F.2d 528, 529 (7th Cir. 1967). In addition, a reviewing court may not "displace the Board's choice between two fairly conflicting views [of the evidence], even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed.2d 456 (1951).

### (1) Discharges.

One of the protected rights of employees under section 7 of the Act is the right to strike. The strike began on May 23 as a recognitional strike. However, after Maierhofer threatened strikers with discharge, the strike was converted to an unfair labor practices strike entitling strikers to unconditional reinstatement. *See NLRB v. International Van Lines*, 409 U.S. 48, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972); *Mastro Plastics Co. v. NLRB*, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956). That evening the Company sent the following telegram to striking employees:

> We are asking you to report to work at our terminal 2N225 Grace St., Lombard, Illinois at 8 A.M. Thursday, May 24, 1979. If you do not report, we will take this to mean that you have voluntarily terminated your employment with Berger Transfer and Storage, Inc. If you terminate your employment, your hospitalization

will be terminated at midnight, May 31, 1979. If you contact us, we will advise the procedure to convert your personal policy.

> Berger Transfer & Storage, Inc.
> 2N225 Grace Street
> Lombard, Illinois

■ The Board concluded that the employees were discharged for their union activities and that the Company's follow-up telegram of May 28 did not cure the violation but instead was a factor to consider in any remedial order. Although the Company asserts that the employees "quit," the total atmosphere of hostility promoted by the Company supports the inference of a section 8(a)(3) violation and discredits the Company's argument about the second telegram.

### (2) Layoffs.

■ Where anti-union considerations result in the layoff of employees, the employer has violated section 8(a)(3) of the Act. *NLRB v. Gogin*, 575 F.2d 596 (7th Cir. 1978). The testimony before the ALJ established that during the week of May 21, several employees were laid off when the Company failed to book jobs on Mondays and Tuesdays. Furthermore employee Redman testified that he overheard Manager Harris state that he had work for "thirty guys" but was not using them because of the organizational drive. Appendix for Appellant at 14. The record therefore supports the finding that the motivation for the threats and actual layoffs was anti-union animus and not economic compulsion.

### (3) Demotion of Gocha.

■ The demotion of an employee for engaging in protected union activities is a violation of section 8(a)(3) of the Act. *NLRB v. Fry Foods, Inc.*, 609 F.2d 267, 270 (6th Cir. 1979); *see also Electri-Flex Co. v. NLRB*, 570 F.2d 1327 (7th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978) (transfer of pro-union employee from set-up man to machine operator violates section 8(a)(3)). Although there was testimony that Gocha was demoted because of

customer complaints, the Board found the claimed justification to be a pretext, citing Harris' explanation that Gocha was no longer warehouse foreman because of his union sympathy. There is substantial evidence in the record to support this finding, particularly since no evidence was introduced that Gocha was aware of the customer complaints or the Company's displeasure with his work.

### C. Section 8(a)(5) Violation.

The evidence shows that on May 23 the Union had collected signed authorization cards from twenty-eight employees. The Board found that the appropriate unit consisted of forty-two employees, giving the Union majority status. It is well established that the National Labor Relations Act authorizes two methods for the confirmation of a binding bargaining relationship between an employer and a labor union. Generally, Board certification of a union's election success is the prevalent and preferred practice, but it is not the only one; an employer may voluntarily recognize the union upon some demonstrable showing of majority status, i.e., union authorization cards.[2]

 Although an employer generally has the right to refuse to recognize a card based majority and to demand an election, an employer who engages in unfair labor practices "likely to destroy the union's majority and seriously impede the election" may not insist that before it bargains an election be held. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 600, 89 S.Ct. 1918, 1933, 23 L.Ed.2d 547 (1969). Therefore, when a union requests recognition and bargaining from an employer which has been presented with cards showing a majority support for the union, and the employer subsequently engages in unfair labor practices which destroy the "laboratory conditions" needed for a fair election, the employer forfeits any right to an election and must bargain with

the union or violate section 8(a)(5) of the Act. Whether or not the union maintains majority status in the face of the employer's unfair labor practices is irrelevant to such a violation finding. *Gissel* at 610, 89 S.Ct. at 1938.

 The evidence is clear that the Union had valid authorization cards from twenty-eight of the forty-two employees within the bargaining unit and properly requested recognition by the Company. The Company's response was an onslaught of flagrant, unfair labor practices. Under these circumstances there is substantial evidence to support the finding of a section 8(a)(5) violation.

### IV. PROPRIETY OF A GISSEL BARGAINING ORDER.

 In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1968), the remedial power of the Board to issue a bargaining order was recognized not only in exceptional cases where, regardless of majority status, outrageous and pervasive unfair labor practices required the bargaining order, but also in less extraordinary cases marked by less pervasive practices which, nonetheless, still have the tendency to undermine majority strength and impede the election process. *Gissel* at 614, 89 S.Ct. at 1940.

> If the Board finds that the possibility of erasing the effects of past practices and of insuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue.

*Gissel* at 614–15, 89 S.Ct. at 1940–41. The determination to issue a bargaining order is not for the courts but for the Board based upon its expert estimate as to the effects on

---

2. The respondent does not contest the appropriateness of the bargaining unit or the cards lack of ambiguity. However, an exception was filed to the ALJ's finding that the cards were properly signed before a union agent. (A–27).

The Board adopted the ALJ's finding. Here is another example of the deference to be given the ALJ and the Board in credibility determinations. *See also Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503, 507–08 (7th Cir. 1980).

the election process of unfair labor practices of varying intensity. *Gissel* at 612 n.32, 89 S.Ct. at 1939 n.32.

In applying the *Gissel* analysis, this court in *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108 (7th Cir. 1973) and *Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503 (7th Cir. 1980), has required the Board to make

> "specific findings" as to the immediate and residual impact of the unfair labor practices on the election process ... and a "detailed analysis" assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring misconduct, and the potential effectiveness of ordinary remedies.

484 F.2d at 1118.

*Red Oaks* reiterated the admonition in *Peerless* that in the absence of an express articulated consideration of the propriety of a bargaining order, this court will presume that an election is the preferred means for determining representative status. However, *Red Oaks* further held that in extreme cases where the reasons for the Board's decision, although not expressly stated, are obvious, the presumption against a *Gissel* order will not arise.[3]

A parallel to the instant case is found in *Justak Brothers and Co., Inc. v. NLRB*, 664 F.2d 1074 (7th Cir. 1981). Reminiscing that the purpose behind *Peerless* is to permit the court to perform its tasks of judicial review, *Justak* goes on to point out that the requirements of *Peerless* are meant "neither to burden the Board nor to curtail the issuance of bargaining orders." *Id.* at 1081. Furthermore, "[e]laborate explanations are not essential; indeed, scientific accuracy in estimating the impact of unfair labor practices is impossible. Rather, we only require that the Board delineate the factors that it considers in its estimation, and describe how these factors have been weighed." *Id.*

In *Justak* the employer's section 8(a)(1) violations commenced the day following a union organizational meeting and consisted of: threats of discharge, layoff and plant closure, threats of investigations and deportations, creating the impression of surveillance, interrogations, promises of benefits, and creating wage increases. Illegal discharges began two days after the organizational meeting and the employer refused to bargain with the union after being presented with signed authorization cards from a majority of the employees in the bargaining unit. In reviewing the record and upholding the Board's bargaining order in *Justak*, this court noted that the systematic campaign of unfair labor practices designed to destroy the union's support was committed by supervisors and management, including the highest corporate official. "Common sense recognizes the traumatic and long term effect of such threats." *Justak* at 1082. This court also noted that the probable impact of unfair labor practices is increased when a small bargaining unit is involved and violations are not minor. In *Justak*, threats were made and executed.

The relationship of the Company and the Union in this case match each of the *Justak* distinctions. Specifically, there was a systematic campaign of unfair labor practices committed by supervisors and high ranking management. The bargaining unit is small. The violations committed by the Company were major. Threats were made and carried out, and the tactics of the Company sank to the point where violence was committed upon the Union's picketers.

The Board in *Justak* "identified and discussed the unfair labor practices it relied on, noted their tendency to undermine the union's majority—especially with regard to their lingering effects—and evaluated the adequacy of traditional remedies." *Justak* at 1081–82. Although the Board in this case adequately identified the unfair labor practices relied upon and their

---

**3.** The exception in *Red Oaks* has been reaffirmed in *Justak Brothers and Co., Inc. v. NLRB*, 664 F.2d 1074, 1081 n.2 (7th Cir. 1981), where this court noted that "even if the Board fails to justify its issuance of a bargaining order, as long as the record is clear this court may review it ...."

lingering effect, it failed to articulate specifically the inadequacy of traditional remedies. Under the rationale of *Justak*, however, common sense should dictate such a conclusion. Since, "actions speak louder than words," the assaults perpetrated upon the Union's picketers clearly support the decision, although not expressly stated, that traditional remedies are inadequate.

For the reasons advanced, the order of the National Labor Relations Board is enforced.